# United States Court of Appeals
## For the First Circuit

Nos. 20-2078, 20-2079

UNITED STATES OF AMERICA,

Appellee,

v.

MAURICE DIGGINS,

Defendant-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Thompson, and Gelpí,
Circuit Judges.

William T. Murphy, on brief for appellant.
Darcie N. McElwee, United States Attorney; Benjamin Block,
Assistant United States Attorney; Kristen Clarke, Assistant
Attorney General; Pamela S. Karlan, Principal Deputy Assistant
Attorney General; and Thomas Chandler and Brant S. Levine,
Attorneys, Appellate Section, Department of Justice, on brief for
appellee.

June 8, 2022

**GELPÍ, Circuit Judge**. A jury convicted Maurice Diggins ("Diggins") of two counts of committing a hate crime and one count of conspiring to commit a hate crime under the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act (the "Shepard-Byrd Act"), 18 U.S.C. §§ 249(a)(1), 371.[1] On appeal, Diggins challenges Congress's ability under § 2 of the Thirteenth Amendment to pass § 249(a)(1), contending that the Supreme Court's expansive articulation of § 2 authority in Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968), has been curtailed or overruled by the Court's subsequent decisions in City of Boerne v. Flores, 521 U.S. 507 (1997), and Shelby County v. Holder, 570 U.S. 529 (2013). He further asserts that the government failed to satisfy the procedural requirements of 18 U.S.C. § 249(b)(1). Lastly, Diggins contests the admission into evidence of his white-supremacist tattoos and expert testimony relating to the same. We affirm the judgment of the district court, holding that Diggins's first two arguments are unavailing and the third argument has been waived.

---

[1] In pertinent part, 18 U.S.C. § 249(a)(1) makes it a crime to "willfully cause[] bodily injury to any person . . . because of the actual or perceived race, color, religion, or national origin of any person."  18 U.S.C. § 371, in turn, proscribes "two or more persons conspir[ing] . . . to commit any offense against the United States" where "one or more of such persons do any act to effect the object of the conspiracy."

BACKGROUND

## I. The Attacks

On the night of April 15, 2018, Diggins and his nephew violently attacked two Black men in separate incidents. In each attack, Diggins and his nephew hurled racial slurs at their target, striking him in the head and shattering his jaw. Both victims suffered serious injuries which required emergency surgery and hospitalization. They continue to suffer lasting physical, emotional, and financial consequences.

In the first attack, Diggins and his nephew approached A.N., a Black man and Sudanese refugee who was quietly smoking on the sidewalk outside a bar in Portland, Maine. Diggins and his nephew are both white men, with Diggins being the taller and larger of the two. Neither man had ever met A.N. before. Without any provocation, and before A.N. was able to react, Diggins punched A.N. in the face. A.N. fled, bloodied and in pain, pursued by the smaller man. As A.N. escaped, he heard someone yell behind him, "[C]ome here, nigger, come here, nigger." A.N. required emergency surgery for his broken jaw the following day at the Maine Medical Center. The surgeon implanted a metal plate into A.N.'s jaw and wired it shut for several weeks, during which time he was unable to eat, work, or even hold his infant daughter.

Later that evening, Diggins and his nephew drove to a 7-Eleven in Biddeford, Maine, where D.M., a Black man, had gone to

buy snacks. D.M. had never encountered Diggins or his nephew prior to that evening. Diggins sped into the parking lot and pulled up toward D.M., who was on foot, yelling, "[N]igger, who you eyeballing?" Diggins proceeded to exit his vehicle and aggressively approach D.M., distracting him while Diggins's nephew came from behind the vehicle and punched D.M. in the face. The force of the punch broke D.M.'s jaw and knocked him to the ground. D.M. testified that after he fell, Diggins punched him in the back of his head. Suffering "unexplainable" pain and fearing for his life, D.M. fled. As Diggins or his nephew laughed, Diggins's nephew pursued him on foot, yelling, "un, nigger." Subsequently, Diggins and his nephew re-entered their vehicle and drove in D.M.'s direction, shouting, "We're going to find you, nigger."

The next day, D.M. underwent emergency surgery at the Maine Medical Center, where his jaw was wired shut. In the weeks following the attack, D.M. lost both of his jobs and incurred substantial medical expenses. As a consequence, he has also faced financial challenges as well as long-lasting physical and psychological harm.

## II. Procedural History

Following an initial federal indictment in August 2018, a grand jury in March 2019 returned a superseding indictment charging Diggins and his nephew with two counts of committing a hate crime in violation of 18 U.S.C. § 249(a)(1) and one count of

conspiring to commit a hate crime in violation of 18 U.S.C. §§ 249(a)(1)(A), 371.[2] Along with the indictment, the Assistant Attorney General for the Civil Rights Division filed a certificate pursuant to 18 U.S.C. § 249(b)(1) averring that prosecuting Diggins and his nephew for violating § 249 would be "in the public interest and necessary to secure substantial justice."[3] Diggins moved to dismiss the superseding indictment, challenging the constitutionality of 18 U.S.C. § 249(a)(1) and separately contending that the certification did not satisfy the requirements of 18 U.S.C. § 249(b)(1).[4] The district court rejected both arguments. United States v. Diggins, 435 F. Supp. 3d 268 (D. Me. 2019). Diggins also filed a pretrial motion in limine to exclude evidence and expert testimony relating to certain of his tattoos associated with white-supremacist ideology, including four swastikas, two lightning bolts associated with the Nazi SS, the letters "WPWW" (referring to "White Pride World Wide"), and an image of an Absolut Vodka bottle containing the phrases "white

---

[2] Diggins was initially charged in state court for conspiracy to commit aggravated assault in violation of Maine law, but said criminal action was later dismissed following Diggins's federal indictment.

[3] That statement, subparagraph (D) of § 249(b)(1), is one of four grounds the Assistant Attorney General may offer as reason to invoke the federal prosecutorial power. We discuss the Assistant Attorney General's certification infra Section I.D and Part II.

[4] Diggins's nephew subsequently pleaded guilty. Hence, this appeal pertains only to Diggins.

pride" and "We must secure the existence of our people and a future for white children." The district court denied the motion, and at trial the expert witness testified that Diggins's tattoos are extensively associated with extremist and white-supremacist ideologies. A jury subsequently convicted Diggins on all charges, and Diggins was sentenced to 60 months' imprisonment for the conspiracy charge and 120 months' imprisonment for each hate crime charge, to be served concurrently. At sentencing, the court stressed the gravity of Diggins's conduct, noting that his "crimes were among the most serious that [the court] ha[s] ever seen" and highlighting the severe impact of his "bigotry, ignorance, and violence" both on his direct victims and the "entire minority community."

On appeal, Diggins does not dispute that he attacked both A.N. and D.M. because of their race, to wit, the basis of his conviction.[5] Rather, he challenges the constitutionality of 18 U.S.C. § 249(a)(1) and asserts deficiencies in the certification process pursuant to 18 U.S.C. § 249(b)(1). Diggins also appears to challenge the denial of his motion to suppress evidence and

_____

[5] The record evidences that Diggins did not object at trial to the jury instructions pertaining to whether his actions satisfied the elements of § 249(a)(1), or to the verdict form used. On appeal, he makes no claims as to these matters, nor does he challenge his sentence.

expert testimony relating to his tattoos, although he does not mention the issue in the Argument section of his opening brief.

## DISCUSSION

Congress exercised its enforcement powers under § 2 of the Thirteenth Amendment to enact 18 U.S.C. § 249(a)(1), a provision of the Shepard-Byrd Act, under which Diggins was convicted. The government contends said provision is constitutional under the rational-determination test the Supreme Court articulated in Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968), to evaluate legislation enacted under § 2 of the Thirteenth Amendment. Diggins disagrees and contends that § 249(a)(1) fails the Jones test. He further contends that the constitutional landscape established by Jones has been eroded by the Supreme Court's subsequent decisions in City of Boerne v. Flores, 521 U.S. 507 (1997), and Shelby County v. Holder, 570 U.S. 529 (2013), which dealt with the Fourteenth and Fifteenth Amendments, respectively. He avers that the same federalism concerns driving those cases are presented here, and we should therefore apply the tests articulated there -- as opposed to that in Jones -- to evaluate the constitutionality of § 249(a)(1). We reject Diggins's arguments here, as well as his two others, for the reasons discussed seriatim.

## I. Constitutionality of 18 U.S.C. § 249(a)(1)

### A.    Standard of Review

We review the constitutionality of federal statutes de novo.  See United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011).

### B.    The Thirteenth Amendment Enforcement Power Under Jones

Our analysis begins by reviewing the Thirteenth Amendment's enforcement power.  Ratified in the wake of the Civil War, the Thirteenth Amendment declares in its first section that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1. Section Two provides that "Congress shall have power to enforce this article by appropriate legislation."  Id. § 2.[6]  Uniquely among the Reconstruction Amendments, the Thirteenth Amendment's Enforcement Clause lacks a state-action provision, instead empowering Congress to directly regulate private conduct.  See The Civil Rights Cases, 109 U.S. 3, 20 (1883) (noting that § 2

---

[6] The wording of Section Two alludes to the Supreme Court's language in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819) ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." (emphasis added)).  See Jack M. Balkin, The Reconstruction Power, 85 N.Y.U. L. Rev. 1801, 1810 & n.34 (2010).

authorizes legislation that is "primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States"); Griffin v. Breckenridge, 403 U.S. 88, 105 (1971) ("[T]here has never been any doubt of the power of Congress to impose liability on private persons under § 2 of th[e Thirteenth] [A]mendment . . . .").

Modern Thirteenth Amendment jurisprudence dates back fifty-four years to Jones, which reconsidered an earlier line of post-Reconstruction caselaw wherein the Supreme Court took a narrower view of Congress's enforcement powers under § 2.[7] Adopting in substantial measure Justice John Marshall Harlan's

---

[7] Beginning with the 1888 Civil Rights Cases, the Court affirmed that § 2, in theory, "clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." The Civil Rights Cases, 109 U.S. at 20. In practice, however, the Court consistently invalidated legislation enacted under the Thirteenth Amendment, adopting a highly restrictive interpretation of the "badges and incidents of slavery." See id. at 20, 22 (holding that § 2 did not authorize passage of the Civil Rights Act of 1875); Plessy v. Ferguson, 163 U.S. 537, 542 (1896) (determining that segregation "cannot be justly regarded as imposing any badge of slavery"), overruled by Brown v. Bd. of Educ., 347 U.S. 485 (1954); Hodges v. United States, 203 U.S. 1, 8 (1906) (holding that § 2 only empowers Congress to outlaw private conduct so extreme as to impose "the state of entire subjection of one person to the will of another"), overruled in part by Jones, 392 U.S. 409.

dissents in those cases,[8] Jones reassessed the scope of Congress's ability to legislate against the "badges and incidents of slavery," affirming that § 2 "empower[s] Congress to do much more" than merely effect the abolition of slavery announced in § 1.  Jones, 392 U.S. at 439.

Jones concerned a challenge to 42 U.S.C. § 1982, originally passed as a provision of the Civil Rights Act of 1866, which forbids racial discrimination in the lease and sale of private property.  As described by Senator Lyman Trumbull, who authored the Thirteenth Amendment and first introduced the Civil

---

[8] In a series of vociferous dissents, Justice Harlan excoriated the Court's restrictive reading of § 2.  See The Civil Rights Cases, 109 U.S. at 26 (Harlan, J., dissenting) ("The opinion in these cases proceeds, as it seems to me, upon grounds entirely too narrow and artificial.  The substance and spirit of the recent amendments of the Constitution have been sacrificed by a subtle and ingenious verbal criticism."); Plessy, 163 U.S. at 562 (Harlan, J., dissenting) ("The arbitrary separation of citizens, on the basis of race, while they are on a public highway, is a badge of servitude wholly inconsistent with the civil freedom and the equality before the law established by the constitution."); Hodges, 203 U.S. at 37-38 (Harlan, J., dissenting) ("The interpretation now placed on the 13th Amendment is . . . entirely too narrow, and is hostile to the freedom established by the Supreme Law of the land."); see also United States v. Nelson, 277 F.3d 164, 181-83 (2d Cir. 2002) (summarizing the evolution in caselaw from the Civil Rights Cases to Jones and concluding that "Justice Harlan's reading of the Thirteenth Amendment's enforcement clause, including, critically, his account of the scope of congressional discretion under that clause, has in principal part prevailed").  For a historical account of Justice Harlan's dissents in the Court's post-Reconstruction caselaw, see generally Peter S. Canellos, The Great Dissenter:  The Story of John Marshall Harlan, America's Judicial Hero 256-70, 329-51 (2021).

Rights Act of 1866 on the Senate floor, the Act was "intended to give effect" to the Thirteenth Amendment's guarantee of liberty, "secur[ing] to all persons within the United States practical freedom." Jones, 392 U.S. at 431 (quoting Cong. Globe, 39th Cong., 1st Sess. 474 (1866) (statement of Sen. Trumbull)); see also Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 714-22 (1989) (recounting the passage of the Act and extensively quoting Senator Trumbull); Springer v. Seaman, 821 F.2d 871, 881 (1st Cir. 1987) (noting that the "unequivocal language" and "legislative history" of the Civil Rights Act of 1866 "manifests Congress' purpose to enact sweeping legislation implementing the [T]hirteenth [A]mendment to abolish all the remaining badges and vestiges of the slavery system" (quotation omitted)), abrogated on other grounds by Jett, 491 U.S. 701.

In reconstructing the meaning and scope of § 2 of the Thirteenth Amendment, the Jones Court closely examined the legislative history of the Civil Rights Act, quoting at length Senator Trumbull's description of the "fair meaning of the amendment":

> I have no doubt that under this provision . . . we may destroy all these discriminations in civil rights against the black man; and if we cannot, our constitutional amendment amounts to nothing. It was for that purpose that the second clause of that amendment was adopted, which says that Congress shall have authority, by appropriate legislation, to carry into effect the article

- 11 -

> prohibiting slavery. Who is to decide what
> that appropriate legislation is to be? The
> Congress of the United States; and it is for
> Congress to adopt such appropriate legislation
> as it may think proper, so that it be a means
> to accomplish the end.

Jones, 392 U.S. at 440 (alteration in original) (quoting Cong. Globe, 39th Cong., 1st Sess. 322 (statement of Sen. Trumbull)). Endorsing Senator Trumbull's interpretation, the Court announced a very broad standard to evaluate legislation passed under Congress's § 2 authority: "Surely Senator Trumbull was right. Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." Id. Applying this rational-determination framework, the Court held that racial discrimination in sales and leases of property constituted "a relic of slavery." Id. at 440-43. Accordingly, the Court held that Congress acted rationally -- and thus, constitutionally -- in exercising its § 2 authority to proscribe such discrimination. Under Jones, so long as Congress rationally determines that conduct is a "badge" or "incident" of slavery, statutes passed in reliance on Congress's § 2 authority pass constitutional muster. Jones, 392 U.S. at 440.

The Fourth Circuit recently held that "Jones remains the seminal Supreme Court case on Congress's enforcement power under § 2 of the Thirteenth Amendment," providing the "governing

- 12 -

standard" for challenges to legislation enacted thereunder. United States v. Roof, 10 F.4th 314, 392 (4th Cir. 2021), petition for cert. filed, No. 21-7234 (U.S. Feb. 24, 2022). Indeed, subsequent Supreme Court caselaw has repeatedly reaffirmed that § 2 vests Congress with authority to legislate against racial discrimination and violence in a variety of contexts, and that courts are to review such legislation under Jones's rational-determination standard. See, e.g., Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 435 (1973) (Jones extends to the racially discriminatory membership policy of a local swimming club); Runyon v. McCrary, 427 U.S. 160, 168, 179 (1976) (§ 2 enables legislation prohibiting racial discrimination in private contracts); Breckenridge, 403 U.S. at 104-05 (§ 2 authorizes creation of a private right of action for victims of conspiracies to be deprived of privileges and immunities or equal protection of the laws); Patterson v. McLean Credit Union, 491 U.S. 164, 171 (1988) (reaffirming Runyon).

**C. 18 U.S.C. § 249(a)(1) Is Constitutional Under Jones**

Applying Jones's rational-determination standard, which Diggins concedes is "controlling" of and "binding" on his case, we conclude that § 249(a)(1) is a constitutional exercise of Congress's power under the Thirteenth Amendment. In so holding, we are joined by every other circuit to have considered the question. See Roof, 10 F.4th at 392; United States v. Metcalf,

- 13 -

881 F.3d 641, 645 (8th Cir. 2018); United States v. Cannon, 750 F.3d 492, 502 (5th Cir.), cert. denied, 574 U.S. 1029 (2014); United States v. Hatch, 722 F.3d 1193, 1204-05 (10th Cir. 2013), cert. denied, 572 U.S. 1018 (2014); United States v. Maybee, 687 F.3d 1026, 1031 (8th Cir.), cert. denied, 568 U.S. 991 (2012).

In 2009, Congress passed the Shepard-Byrd Act to combat hate crimes motivated by race and other protected characteristics. Diggins was convicted of violating a provision of the Act codified at 18 U.S.C § 249(a)(1), which in relevant part makes it illegal to "willfully cause[] bodily injury to any person . . . because of the actual or perceived race, color, religion, or national origin of any person." Congress expressly relied on its authority under § 2 in enacting § 249(a)(1), determining in its legislative findings of fact that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." 34 U.S.C. § 30501(7). Congress thus passed § 249(a)(1) in recognition of the intrinsic and inconvertible connections between racial violence and slavery:

> For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry.

- 14 -

Id.

As "over a century of sad history" demonstrates, "concluding there is a relationship between slavery and racial violence 'is not merely rational, but inescapable.'" Roof, 10 F.4th at 392 (quoting United States v. Beebe, 807 F. Supp. 2d 1045, 1052 (D.N.M. 2011), aff'd sub nom. Hatch, 722 F.3d 1193); see also United States v. Nelson, 277 F.3d 164, 189-90 (2d Cir. 2002) (summarizing a wealth of scholarship on the "indubitable connections . . . between American slavery and private violence" and concluding that proscribing "private violence motivated by the victim's race . . . falls comfortably within Congress's" § 2 authority). Racial subjugation through physical violence was indispensable to maintaining slavery. See Hatch, 722 F.3d at 1206 (noting that antebellum courts recognized "unrestrained master-on-slave violence as one of slavery's most necessary features" and collecting sources); State v. Mann, 13 N.C. (2 Dev.) 263, 266-67 (1829) (characterizing "uncontrolled authority over the body" as "inherent in the relation of master and slave"). Indeed, the violence in the record before us -- attacks against two Black men born of white-supremacist ideology -- constitutes the paradigmatic "badge and incident" or "relic of slavery" that the Thirteenth Amendment exists to eliminate. Jones, 392 U.S. at 441, 443. As such, we join every other circuit to have evaluated the provision

to conclude that § 249(a)(1) constitutes "appropriate legislation" under § 2.

Despite overwhelming judicial consensus, Diggins urges that we forge a separate path and adopt a more restricted interpretation of Jones, arguing that a straightforward application of the rational-determination standard might countenance all manner of purported legislative overreaching. To this end, Diggins cites the Tenth Circuit's dicta in Hatch stating that a wide range of conduct could hypothetically "be analogized to slavery" and be "thereby labeled a badge or incident of slavery under Jones's rational determination test," if the latter were taken at face value. Hatch, 722 F.3d at 1204. Diggins appears to insist on reading Jones narrowly to invalidate § 249(a)(1), either as an exercise in irrational policymaking, or "as applied" to his conduct.[9]

We are wholly unpersuaded. As the Tenth Circuit explained in Hatch, regardless of the facial breadth of Jones, § 249(a)(1) adopts "a limited approach to badges-and-incidents" that "focuses on three connected considerations: (1) the salient

_____

[9] Diggins does not allege that the government failed to prove the elements of § 249(a)(1) beyond a reasonable doubt, so the nature of his "as applied" challenge -- by which he purports to distinguish cases such as Roof -- is unclear. To the extent Diggins argues here that the government erred in choosing to prosecute him under § 249(a)(1), his claim merely restates his separate challenge to the certification process of § 249(b)(1), which we consider and reject infra Part II.

- 16 -

characteristic of the victim, (2) the state of mind of the person subjecting the victim to some prohibited conduct, and (3) the prohibited conduct itself." Id. at 1205-06. Accordingly, Congress drafted § 249(a)(1) to extend "only to persons who embody a trait that equates to 'race' as that term was understood in the 1860." Id. at 1206.[10] Section 249(a)(1) further requires a clear nexus between the protected characteristic and the prohibited conduct, covering only violence that occurs "because of" the victim's "actual or perceived race, color, religion, or national origin." 18 U.S.C. § 249(a)(1). Finally, this provision only targets conduct -- "willfully cause[d] bodily injury" -- whose connection to slavery is, as we just detailed, beyond contestation. Id.; see Roof, 10 F.4th at 392; Nelson, 277 F.3d at 189-90.

---

[10] While § 249(a)(1) covers "religion" and "national origin" in addition to "race" and "color," Congress was careful to note in its legislative findings that "at the time when the 13th, 14th, and 15th amendments to the Constitution of the United States were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct 'races.'" 34 U.S.C. § 30501(8). Thus, "at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution," Congress concluded that "prohibit[ing] assaults on the basis of real or perceived religions or national origins" similarly served to eliminate the "badges, incidents, and relics of slavery." Id.; see Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 617 (1987) (noting that 19th-century "definitions of race . . . were not the same as they are today," frequently encompassing characteristics better understood today as matters of religion or national origin); Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 610-13 (1987).

- 17 -

In sum, § 249(a)(1) employs a conservative framework, solicitous of the "limiting principles to congressional authority" under Jones, for evaluating whether conduct perpetuates a badge or incident of slavery. Hatch, 722 F.3d at 1205. To be clear, the Tenth Circuit expressly disclaimed holding that this tripartite approach is required by Jones, id. at 1206, and likewise we do not hold so here. It suffices that § 249(a)(1) exists well within the parameters of the test articulated in Jones. As such, Diggins's attempts to invoke the specter of unbridled § 2 authority fail, because the phantasm of overzealous enforcement does not haunt the provision at issue. By any measure, Congress's judgment that racially motivated violence constitutes one of the badges and incidents of slavery easily satisfies Jones's rational-determination test.

## D. Section 249(a)(1) Does Not Implicate Federalism Concerns

Perhaps recognizing his fate under Jones, Diggins also contends that the analyses in the Supreme Court's decisions in City of Boerne v. Flores, 521 U.S. 507 (1997), and Shelby County v. Holder, 570 U.S. 529 (2013), effectively render Jones a dead letter.[11] We are in no position to overrule binding Supreme Court

---

[11] In support of this argument, Diggins points to cautionary language about Jones in Judge Elrod's special concurrence in Cannon and highlights dicta to similar effect in Hatch. See Cannon, 750 F.3d at 514 (Elrod, J., specially concurring) (asserting that cases such as City of Boerne and Shelby County expose "tensions between several lines of the Supreme Court's constitutional

- 18 -

precedent.  See United States v. McIvery, 806 F.3d 645, 653 (1st Cir. 2015) ("Unless and until the Supreme Court overrules [its precedent], we must continue to adhere to it." (citing Rodríguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989))). Regardless, we absolutely disagree with Diggins's postulation.

We start our analysis with City of Boerne, whose backdrop begins with Sherbert v. Verner, 374 U.S. 398, 402-03 (1963), in which the Supreme Court held that governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest, i.e., strict scrutiny.[12]  Then, in Employment Division v. Smith, 494 U.S. 872 (1990), the Supreme Court limited the applicability of the Sherbert test and held that free exercise challenges to neutral, generally applicable laws are subject only to rational basis review.  See Smith, 494 U.S. at 888-90 (1990).  Responding to Smith, Congress enacted the Religious Freedom Restoration Act, commonly known as RFRA.  Pub. L. 103-141, 107 Stat. 1488 (1993) (codified at 42 U.S.C §§ 2000bb to bb-4). Congress expressly crafted RFRA "to restore the compelling

_____

jurisprudence"); Hatch, 722 F.3d at 1204-05 (speculating that "broad use of Section 2 power . . . would arguably raise the sort of federalism concerns articulated in City of Boerne").  For the reasons stated below, we flatly reject any notion that City of Boerne and Shelby County cast doubt on Jones's reasoning.

[12] In practice, application of the Sherbert test was more nuanced.  See generally Eugene Volokh, A Common-Law Model for Religious Exemptions, 46 UCLA L. Rev. 1465, 1494-1501 (1999).

interest test as set forth in Sherbert . . . and Wisconsin v. Yoder, 406 U.S. 205 (1972)" and to abrogate Smith, see 42 U.S.C § 2000bb(a)(4)-(5), (b)(1), and thus supplied a rule of decision for constitutional free exercise claims. RFRA prohibited both the federal government and state governments from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability, except" when the government could show that the burden was the "the least restrictive means of furthering [a] compelling governmental interest." See id. § 2000bb-1(a), (b).

City of Boerne held RFRA unconstitutional as applied to states. The analysis turned on two separation of powers issues, one horizontal and one vertical. See 521 U.S. at 517-520. The horizontal issue was whether Congress could define the substance of the rights protected by the Fourteenth Amendment. See id. Examining the amendment's structure, ratification history, and subsequent caselaw, the Court held that Congress could not do so. See id. at 520-25. Section 5 of the Fourteenth Amendment, the Court explained, affords Congress an "enforcement power" of "remedial and preventive nature," id. at 524 (citing The Civil Rights Cases), not the power to define the substantive scope of the rights defined by § 1 of that Amendment and enforce the same against the states, id. at 527-29. The Court grounded this holding in its extensive recounting of the ratification history of the

- 20 -

amendment, finding that "[t]he Fourteenth Amendment's history confirms the remedial, rather than substantive, nature of the Enforcement Clause." Id. at 520. Equally, the Court emphasized that the limited "nature of Congress' enforcement power . . . w[as] confirmed in our earliest cases on the Fourteenth Amendment." Id. at 524. "If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.'" Id. at 529 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). Not only would a substantive, rather than remedial, interpretation of § 5 upset the judiciary's authority to interpret the Constitution, it would also allow Congress to trample on the states. See id. at 527 (citing Oregon v. Mitchell, 400 U.S. 112 (1970)).

The Court then turned to the vertical question: whether Congress could constitutionally impose RFRA on the states under its authority to remedy violations of the Fourteenth Amendment. This question, too, it answered in the negative. The Court held that Congress may sometimes enact legislation to prevent future harms, but only when there is "a congruence between the means used and the ends to be achieved. The appropriateness of remedial measures must be considered in light of the evil presented." Id. at 530. RFRA, said the Court, failed that congruence and proportionality test, because it was "so out of proportion to a

supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 532. RFRA's "[s]weeping coverage" impermissibly "ensure[d] its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." Id. Congress imposed that sweeping coverage on states despite no examples in the legislative record of state laws of general applicability "passed because of religious bigotry." Id. at 530. The Court thus held that the "considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens," id. at 534, fell outside Congress's limited legislative authority and upset the "federal balance," id. at 536. This holding, however, was limited to the states as RFRA continues to govern the federal government. See Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 695 (2014); Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 n.1 (2006).

Our discussion and analysis of City of Boerne clearly suggests why Congress's enactment of § 249(a)(1) under the Thirteenth Amendment was nothing like its enactment of RFRA under the Fourteenth Amendment. First, we note that nowhere does City of Boerne mention either Jones or the Thirteenth Amendment. Rather, the cases concern two different amendments, each with its

- 22 -

own unique history, structure, and caselaw.  Diggins furnishes no reason to believe that City of Boerne's examination of the Fourteenth Amendment's Enforcement Clause displaces Jones's separate analysis of the of the Thirteenth Amendment.  In fact, the Court in Jones and City of Boerne conducted similar inquiries into each amendment, employing parallel methodologies and modes of reasoning.  Compare, e.g., Jones, 392 U.S. at 437-43 (reviewing the ratification history of the Thirteenth Amendment and concurrent congressional debates concerning the 1866 Civil Rights Act), with City of Boerne, 521 U.S. at 517-27 (examining the history of the Fourteenth Amendment).  The fact that the two cases' shared reasoning may have led to different conclusions reflects that the underlying amendments, and therefore their applications, may vary correspondingly.

Nor was Jones's rational-determination standard -- which Diggins contends "strips all checks on Congress'[s] power" -- undermined by City of Boerne.  This distinction, too, is driven by the varied histories of the Thirteenth and Fourteenth Amendments.  The Fourteenth Amendment permits Congress to enforce only those rights discussed in that amendment, see U.S. Const. amend. XIV, § 5, and "there is a long, well-established, doctrinally rich, and highly sophisticated tradition of judicial interpretation of the substantive protections established by Section One of the Fourteenth Amendment," Nelson, 277 F.3d at 185

n.20. Yet the same does not hold true for Section One of the Thirteenth Amendment, the meaning of which "has almost never been addressed directly by the courts, in the absence of specific congressional legislation enacted." Id. Read together, then, City of Boerne and Jones do not expose a tension in the caselaw, but rather reveal a key structural, textual, and historical dissimilarity between the Reconstruction Amendments.[13]

Comparing § 249(a)(1) with RFRA reveals other crucial dissimilarities. Most importantly, unlike RFRA, § 249(a)(1) does not involve congressional interpretation of the scope of substantive rights protected by the Constitution. The Supreme Court, not Congress, determined that the Thirteenth Amendment bans not just slavery but "substitutes for the slave system." See Jones, 392 U.S. at 442. The Supreme Court, not Congress,

---

[13] Indeed, it has been long recognized -- in caselaw relied on in both City of Boerne and Jones -- that the enforcement clauses of the Thirteenth and Fourteenth Amendments differ at least insofar as the latter imposes a state-action requirement absent in the former. Compare The Civil Rights Cases, 109 U.S. at 20 (noting that § 2 of the Thirteenth Amendment empowers "Congress to adopt direct and primary, as distinguished from corrective, legislation"); with id. at 19 (Congress had exceeded its legislative authority under the Fourteenth Amendment in enacting the Civil Rights Act of 1875 because the latter was "not corrective legislation" but rather "primary and direct" in character); see also City of Boerne, 521 U.S. at 525 (noting that the Fourteenth Amendment's Enforcement Clause "did not authorize Congress to pass 'general legislation upon the rights of the citizen, but corrective legislation . . . for counteracting such laws as the States may adopt or enforce'" (quoting The Civil Rights Cases, 109 U.S. at 13-14)).

- 24 -

determined that review of Congressional determinations of what constitute the "badges and incidents of slavery" are reviewed under the rational-determination standard.  Id. at 440.  The Supreme Court, not Congress, determined that Congress rationally determined that racially motivated violence is a relic of slavery, and thus its prohibition fell within Congress's Thirteenth Amendment enforcement power to obliterate the relics of slavery. See Griffin, 403 U.S. at 105.  Thus, in enacting § 249(a)(1), Congress did not usurp the judiciary's role in interpreting the Constitution and in defining the balance of power between the federal government and the state governments.  Congress enacted § 249(a)(1) within the scheme announced by the Supreme Court, and did not purport to pronounce the scheme the Supreme Court ought to apply.  Additionally, unlike RFRA, § 249(a)(1) does not operate on state governments.  The statute does not diminish the states' police power in any way.

Moreover, even if we were to accept Diggins's invitation to apply City of Boerne here, § 249(a)(1) would still be constitutional.  Unlike with RFRA, Congress made extensive findings about the need for federal assistance to combat the pervasive problem of racially motivated violence.  Congress enacted § 249(a)(1) as part of the Shepard-Byrd Act to address racially motivated violence as a badge or incidence of slavery. The scope and gravity of that harm, Congress determined, is

considerable and widespread. In passing the law, Congress expressly found that "[t]he incidence of violence motivated by the actual or perceived race[] [or] color[] . . . of the victim poses a serious national problem." Pub. L. 111-84 § 4702(1), 123 Stat. at 2835 (codified at 34 U.S.C. § 12361(1)). It further explained:

> For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry.

Pub. L. 111-84 § 4702(7), 123 Stat. at 2836 (codified at 34 U.S.C. § 12361(2)). Congress thus concluded that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." Id. To support those findings and conclusions, Congress made extensive findings on a pervasive national pattern of racially motivated hate crimes.[14] The Supreme

---

[14] See H.R. Rep. 111-86 at 5 (2009) (reporting that "[s]ince 1991, the FBI has identified over 118,000 reported violent hate crimes," of which, for the most recent year, "[r]acially-motivated bias accounted for approximately half (50.8%) of all incidents"); id. at 6-9 (describing the inadequacies of prior federal statues); id. at 7 (articulating state and local needs for "the Federal Government's resources, forensic expertise, and experience in the identification and proof of bias-motivated violence and criminal networks").

Court has similarly recognized the unique harms of racially motivated acts of violence, see Wisconsin v. Mitchell, 508 U.S. 476, 488 (1993), reinforcing Congress's finding.

Further, unlike RFRA, § 249(a)(1) does not prohibit facially constitutional conduct. See United States v. Georgia, 546 U.S. 151, 158-59 (2006). Section 249(a)(1) prohibits persons from actually violating the Thirteenth Amendment by perpetuating a badge or incident of slavery, to wit, racially motivated violence. As we have explained, Congress targeted a narrow category of conduct. It sought to "obliterate," Civil Rights Cases, 109 U.S. at 21, violence designed to communicate and enforce ideas of racial superiority and inferiority, see Hatch, 722 F.3d at 1206. It does not target "facially constitutional conduct[] in order to prevent and deter unconstitutional conduct." Nev. Dept. Hum. Res. v. Hibbs, 538 U.S. 721, 727-28 (2003).

And unlike RFRA, § 249(a)(1) is congruent and proportional to the harm Congress sought to address. The remedy Congress chose is narrow. To address the long and pervasive history of violence targeted at racial minorities, Congress crafted a narrow criminal prohibition, which addresses only actual acts of willful racially motivated violence. Prosecutions may be brought federally only in limited circumstances, each of which Congress connected to an important federal interest or to the lack of a state interest. 18 U.S.C. § 249(b)(1). Given those

- 27 -

circumstances, § 249(a)(1) "cannot be said to be 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" Tennessee v. Lane, 541 U.S. 509, 533 (2004) (quoting City of Boerne, 521 U.S. at 532).

Diggins also relies on Shelby County as another case supposedly undermining Jones, but that case offers him even less support than City of Boerne. In Shelby County, the county challenged the constitutionality of §§ 4(b) and 5 of the Voting Rights Act of 1965, 52 U.S.C. §§ 10303(b), 10304, which Congress enacted using authority under the Fourteenth and Fifteenth Amendments. Those provisions prohibited jurisdictions with a history of racially discriminatory voting restrictions from changing any of their voting rules without prior approval of the Department of Justice. See 52 U.S.C. § 10304. The Court agreed with Shelby County, enjoining enforcement of those provisions of the Voting Rights Act. The Court held that "[t]he Voting Rights Act sharply departs from [several] basic principles" of the American constitutional order: that the federal government may not veto state laws, that "[s]tates retain broad autonomy in structuring their governments and pursuing legislative objectives," and that states enjoy "equal sovereignty" and must be treated alike. Shelby Cnty., 570 U.S. at 542-544. While those extraordinary measures had once been justified, the Court held

that they were no longer constitutionally sanctioned.  Id. at 545-47.  Instead, pointing to improvements in racial disparities in voter turnout since 1965, the Court held that "Congress -- if it is to divide the States -- must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions.  It cannot rely simply on the past."  See id. at 553.  This, the Court determined, Congress failed to do.  See id. at 554.

We reiterate that, like City of Boerne, Shelby County neither expressly nor impliedly overrules Jones.  The Supreme Court did not pronounce on how or whether this standard might apply to different exercises of legislative authority under the Fourteenth and Fifteenth Amendments, much less announce a test applicable to the Thirteenth Amendment's Enforcement Clause.  Further, even if Shelby County can be read to impose a general obligation on Congress to update civil rights laws to account for current conditions, we see no issue with § 249(a)(1).  Congress adopted the law after looking at conditions in 2009, which it found were broadly consistent with historical data.  H.R. Rep. 111-86 at 5 (2009).  Although Diggins insinuates that hate crimes are no longer matters of national significance, he has given us absolutely no reason to think that conditions have shifted enough to deprive Congress of the ability to legislate against racially motivated violence.  To the contrary, in May 2021, Congress found a "dramatic

increase in hate crimes and violence against Asian-Americans and Pacific Islanders," and allocated additional resources to federal programs combatting hate crimes.  See COVID-19 Hate Crimes Act, Pub. L. 117-13, 135 Stat. 265.

Diggins contends that § 249(a)(1) displaces state authority, implicating the same federalism concerns as §§ 4 and 5 of the Voting Rights Act.  Not so.  Unlike the provisions at issue in Shelby County, § 249(a)(1) does not represent an "extraordinary departure from the traditional course of relations between the States and the Federal Government."  Shelby Cnty., 570 U.S. at 557 (quoting Presley v. Etowah Cnty. Comm'n, 502 U.S. 491, 500-01 (1992)).  Rather, § 249(a)(1) is a cornerstone of a scheme of cooperative federalism, representing an ordinary example of one of many parallel state and federal penal laws.  See Gamble v. United States, 139 S. Ct. 1960, 1965-67 (2019).  Indeed, Congress asserted federal jurisdiction to allow the Department of Justice to "work together as partners" with state and local law enforcement.  34 U.S.C. § 30501(9).  Section 249(a)(1) does not allow the federal government to veto state laws or restructure state governance; it says nothing on the subject.  Nor does § 249(a)(1) discriminate between states; it applies uniformly nationwide.

Aware of federalism concerns, see H.R. Rep. 111-86 at 14-15, Congress limited federal prosecutions under § 249(b)(1) to

four scenarios, when the Attorney General (or a designee) certifies that:

>**(A)** the State does not have jurisdiction;

>**(B)** the State has requested that the Federal Government assume jurisdiction;

>**(C)** the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

>**(D)** a prosecution by the United States is in the public interest and necessary to secure substantial justice.

18 U.S.C. § 249(b)(1). The first and second grounds cannot possibly encroach on state authority. When the state lacks jurisdiction, there is no state authority to usurp. And when the state asks for a federal prosecution, its consent alleviates any federalism concerns. The third ground, in turn, allows for federal jurisdiction only when a state has acted and a federal interest remains. The federal government does not diminish state authority when it undertakes a second prosecution after the state has already taken its case to trial. Finally, the fourth ground, while allowing for a more robust assertion of federal interests, still allows the state to undertake any prosecution it wishes to. See Gamble, 139 S. Ct. at 1965-67. In sum, none of the cases in which Congress authorized prosecutions under § 249(a)(1) weaken state authority in any way. Nor can Congress be said to have arrogated to itself a general police power, see Hatch, 722 F.3d at 1203-04,

- 31 -

when it targets only racially motivated violence through cooperation with the states.

The cooperative nature of the federalism here is further evidenced by the statutory context. Congress enacted § 249(a)(1) as part of the Shepard-Byrd Act. Far from usurping state authority, the act enhances state power. It authorizes the Attorney General to "provide technical, forensic, prosecutorial, or any other form of assistance in the criminal investigation or prosecution of" violent hate crimes under state law. Pub. L. 111-84 § 4704(a)(1), 123 Stat. at 2837 (codified at 34 U.S.C. § 30503(a)(1)). It similarly authorizes the Attorney General to award grants to state and local law enforcement agencies "for extraordinary expenses associated with the investigation and prosecution of hate crimes." Pub. L. 111-84 §§ 4704(b)(1), 4705 123 Stat. at 2837 (codified at 34 U.S.C. §§ 30503(b)(1), 30504).[15] That is why twenty-eight state attorneys general lobbied Congress to enact the law, expressing a belief that "federal assistance is critical in fighting the invidious effects of hate crimes." Local Law Enforcement Hate Crimes Prevention Act of 2007: Hearing on H.R. 1589 Before the Subcomm. on Crime, Terrorism & Homeland Sec.,

---

[15] Amendments to the Shepard-Byrd Act, enacted in May 2021, provide for even more resources to help states investigate and prosecute hate crimes. Khalid Jabara and Heather Heyer National Opposition to Hate, Assault, and Threats to Equality Act of 2021, Pub. L. 117-13 § 5, 135 Stat. 265, 266-72 (codified at 34 U.S.C. § 30507).

H. Comm. on the Judiciary 18 (2007) (letter from twenty-seven state attorneys general); accord id. at 23 (letter from Florida attorney general).

*   *   *

Contrary to Diggins's arguments, then, the Court's decisions in City of Boerne and Shelby County neither undermine Jones nor indicate that § 249(a)(1) poses federalism concerns. The mere fact that the Reconstruction Amendments possess similarly worded enforcement clauses and "disclose[] a unity of purpose" at a broad level, see The Slaughter-House Cases, 83 U.S. 36, 67 (1872), does not obviate the obvious. The Thirteenth, Fourteenth, and Fifteenth Amendments are independent and distinct constitutional provisions, each with its unique scope, enforcement clause, and ratification history, and each spawning its own unique jurisprudence. Accordingly, we cannot simply graft doctrines articulated and crafted for entirely separate constitutional provisions onto the Thirteenth Amendment context. Section 249(a)(1) is an attempt to supplement state efforts to address the continuing problem of racially motivated violence. It supports rather than offends principles of federalism. Wherever the boundary on Congress's enforcement power under the Thirteenth Amendment lies, § 249(a)(1) easily falls within it.

## II. Certification under § 249(b)(1)

Diggins next alleges deficiencies in the government's certification of the prosecution pursuant to 18 U.S.C. § 249(b)(1). As described supra Section I.D, prosecutions of offenses under § 249(a) require the "certification in writing of the Attorney General[] or a designee" that one of four conditions exist warranting federal intervention. 18 U.S.C. § 249(b)(1). Pursuant to this provision, the Assistant Attorney General, acting as the Attorney General's designee, certified shortly before the grand jury returned the superseding indictment that the prosecution of Diggins and his nephew under § 249(a)(1) was "in the public interest and necessary to secure substantial justice," one of the four situations contemplated by § 249(b)(1). See id. § 249(b)(1)(D).

Diggins argues that this statement was deficient, suggesting that the Assistant Attorney General's certification must also explain why he made his decision. But Diggins explicitly disclaims arguing that the certification is judicially reviewable, contending that although "[t]he certification can be reviewed, . . . the reviewers are not courts," but rather "the voters." Given this concession, it is unclear what remains of Diggins's contention. Assuming he has not waived his challenge to the certification, he points to no basis in the Constitution or the statute for imposing an additional procedural hurdle on the

Attorney General's exercise of prosecutorial discretion. We find none, either. Rather, it is well established that the decision to prosecute is vested exclusively in the executive branch and is generally not subject to judicial review. See United States v. Santos-Soto, 799 F.3d 49, 62 (1st Cir. 2015) (noting that indictment decisions are "a matter within the sole discretion of the prosecution").

While we have not previously ruled on the reviewability of certifications under § 249(b), along with all but one of our sister circuits we have held unreviewable a similar certification requirement in federal juvenile law, codified at 18 U.S.C. § 5032, which in relevant part requires the Attorney General to confirm that "there is a substantial Federal interest in the case." United States v. Smith, 178 F.3d 22, 25 (1st Cir. 1999); accord United States v. F.S.J., 265 F.3d 764, 768 (9th Cir. 2001); United States v. Doe, 226 F.3d 672, 676-78 (6th Cir. 2000); United States v. Jarrett, 133 F.3d 519, 538-41 (7th Cir. 1998); United States v. Juv. Male, J.A.J., 134 F.3d 905, 906-09 (8th Cir. 1998); In re Sealed Case, 131 F.3d 208, 212-15 (D.C. Cir. 1997); United States v. Juv. No. 1, 118 F.3d 298, 303-07 (5th Cir. 1997); Impounded (Juv. R.G.), 117 F.3d 730, 733-36 (3d Cir. 1997); United States v. I.D.P., 102 F.3d 507, 510-13 (11th Cir. 1996).[16] Our holding in

[16] The Fourth Circuit is unique among appellate courts to hold that certifications of a substantial federal interest under § 5032

- 35 -

<u>Smith</u> that certification under § 5032 is an unreviewable exercise of prosecutorial discretion was based largely on the fact that the provision "does not specifically provide for judicial review of a certification and fails to articulate any standards for determining the existence of a substantial federal interest."[17] <u>Smith</u>, 178 F.3d at 25.

For the same reason, we now hold that certifications made under § 249(b) are exempt from judicial review, as the government urges us to determine. <u>See also</u> <u>United States</u> v. <u>Bowers</u>, 495 F. Supp. 3d 362, 374 (W.D. Pa. 2020) (finding certifications under § 249(b) unreviewable); <u>United States</u> v. <u>Jenkins</u>, 909 F. Supp. 2d 758, 774 (E.D. Ky. 2012) (same). Like § 5032, § 249(b) neither expressly provides for judicial review nor specifies any standards to evaluate the nature of the federal

---

are subject to judicial review. <u>See</u> <u>United States</u> v. <u>Juv. Male No. 1</u>, 86 F.3d 1314, 1317–21 (4th Cir. 1996). In <u>Roof</u>, the Fourth Circuit "assume[d] without deciding" that § 249 certifications are reviewable, but affirmed the certification on the merits and noted that its "scope of review [wa]s limited because the Attorney General's certifications must be afforded substantial deference." 10 F.4th at 396-97.

[17] Analogously, we have held in the context of capital cases that "because the exercise of prosecutorial discretion is a 'core executive constitutional function,'" the guidelines contained in the United States Attorneys' Manual for determining whether to seek the death penalty do not confer substantive rights on defendants. <u>See</u> <u>United States</u> v. <u>Lopez-Matias</u>, 522 F.3d 150, 156 (1st Cir. 2008) (quoting <u>United States</u> v. <u>Armstrong</u>, 517 U.S. 456, 465 (1996)); <u>see also</u> <u>id.</u> (noting that "[w]e are reluctant to interfere with internal prosecutorial measures" in large part out of "a respect for the separation of powers").

interest at stake.  As such, certifications under § 249(b) are "unreviewable act[s] of prosecutorial discretion."  Smith, 178 F.3d at 26.[18]  Diggins's challenge to the certification of his prosecution thus fails.[19]

_____

[18] Diggins attempts to distinguish Smith by asserting that the certification here was "constitutionally defective" rather than a simple exercise of prosecutorial discretion, but this argument merely adverts to the same putative concerns about federalism and the scope of the Thirteenth Amendment that we have already rejected supra Part I.  Cf. Hatch, 722 F.3d at 1207 ("We see no constitutional significance in the certification requirement.").

[19] By way of a letter submitted pursuant to Fed. R. Civ. P. 28(j), Diggins also belatedly suggests that the certification requirement somehow represents an unconstitutional delegation of legislative power, citing as persuasive authority the Fifth Circuit's recent decision in Jarkesy v. SEC, 2022 WL 1563613 (5th Cir. May 18, 2022).  In that case, a divided panel applied the nondelegation doctrine to strike down a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P(a), 124 Stat. 1376 (2010) (codified at 15 U.S.C. § 78u-2(a)) giving the SEC the authority to choose whether to bring certain enforcement actions in Article III courts or in administrative proceedings. See Jarkesy, 2022 WL 1563613, at *8-11.

This contention fails on multiple grounds.  First, because Diggins did not raise any such argument in his opening brief, it is waived.  See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239-40 (1st Cir. 2013) ("[A]rguments not raised in an opening brief are waived.").  Second, Jarkesy is wholly inapposite.  Exercises of prosecutorial discretion are emphatically not administrative delegations, but are -- as noted above -- quintessentially executive decisions.  See Santos-Soto, 799 F.3d 49 at 62; see also Jarkesy, 2022 WL 1563613, at *10 (holding that the decision whether to "assign certain actions to agency adjudication" is a legislative power, but the mere "deci[sion] whether to bring enforcement actions in the first place" is indeed "an executive, not legislative power").  As such, there is no possible nondelegation issue here.  And third, even if nondelegation concerns were somehow applicable, the direction that prosecutions under § 249(b)(1)(D) be "in the public interest and necessary to secure substantial justice" indisputably satisfies the lax "intelligible principle"

## III. The District Court's Evidentiary Rulings

Diggins lastly attempts to challenge the district court's evidentiary rulings concerning the admission into evidence of his white-supremacist tattoos and expert testimony relating to the same. But Diggins fails to develop this argument in his brief, mentioning it only in his statement of the issues and then (obliquely) in his summary of the argument and articulation of the standard of review. He does not again discuss the matter in his argument. This perfunctory treatment is insufficient. We have repeatedly made clear that a party waives an argument when it "neither develops the argument nor accompanies it with even a shred of authority." United States v. González, 981 F.3d 11, 23 (1st Cir. 2020), cert. denied, 141 S. Ct. 1710 (2021). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . ." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1985). Rather, "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." Id. (quoting Rivera-Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)) (internal quotation marks omitted). Because Diggins's opening brief did not

_____

standard under our precedents and those of the Supreme Court. See United States v. Parks, 698 F.3d 1, 7 (1st Cir. 2012) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)); see also id. at 8 (noting that "modern case law tends regularly to disfavor" nondelegation arguments).

develop his contention that the district court abused its discretion in its evidentiary rulings, he has waived the argument.

## CONCLUSION

The judgment below is **affirmed**.