**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

OLE HOUGEN,

*Defendant-Appellant*.

No. 21-10369

D.C. No.
5:20-cr-00432-
EJD-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted March 28, 2023
San Francisco, California

Filed August 1, 2023

Before: Ronald M. Gould and Sandra S. Ikuta, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Gould;
Dissent by Judge Ikuta

---

[*] The Honorable Edward R. Korman, United States District Judge for the
Eastern District of New York, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed Ole Hougen's conviction after a jury trial of attempting to commit racially motivated violence, in violation of 18 U.S.C. § 249(a)(1).

The district court conducted the trial under General Orders, issued in response to the COVID-19 pandemic, providing that only persons having official court business may enter the courthouse, and pursuant to a Clerk's Notice providing for public access through an audio conference line. Hougen contended that in doing so the district court violated his right to a public trial under *United States v. Allen*, 34 F.4th 789 (9th Cir. 2022). The panel held that Hougen forfeited this claim, that plain error review applies, and that the balance of costs in this case counsels against reversal.

Hougen also argued that § 249(a)(1), as applied to his case, exceeds Congress' authority under Section Two of the Thirteenth Amendment, which gives Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." Reviewing *de novo*, the panel held that § 249(a)(1) is a constitutional exercise of Congress' enforcement authority under Section Two. Applying the deferential test set forth in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the panel wrote that the rationality of concluding that violence (or attempted violence) perpetrated against victims on account of the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

victims' race is a badge or incident of slavery is well established. Every other circuit that has addressed this issue has upheld § 249(a)(1)'s constitutionality. And while the Ninth Circuit has not yet addressed this statute, this court upheld a similar criminal prohibition on racially motivated violence interfering with the use of public facilities as a valid exercise of Congress' Thirteenth Amendment power. The panel rejected Hougen's contention that § 249(a)(1) is subject to heightened scrutiny apart from the *Jones* test.

The panel addressed other issues in a contemporaneously filed memorandum disposition.

Judge Ikuta dissented. She wrote that because Congress could not rationally determine that assault or battery motivated by a victim's race, color, religion, or national origin is a badge or incident of slavery, or that § 249(a)(1) is an appropriate remedy for a violation of the Thirteenth Amendment's eradication of slavery and involuntary servitude, § 249(a)(1) was not a valid exercise of Congress's authority under the Thirteenth Amendment.

## COUNSEL

Tamara A. Crepet (argued) and Lara S. Vinnard, Assistant Federal Public Defenders; Jodi Linker, Federal Public Defender; Federal Public Defenders Office, Northern District of California; San Jose, California; Severa Keith, The Keith Law Office PC, San Francisco, California; for Defendant-Appellant.

Sydney A.R. Foster (argued) and Tovah R. Calderon, Attorneys; Kristen Clarke, Assistant Attorney General; United States Department of Justice, Civil Rights Division,

Appellate Section; Washington, D.C.; Matthew M. Yelovich, Assistant United States Attorney; United States Department of Justice, Office of the United States Attorney; San Francisco, California; for Plaintiff-Appellee.

## OPINION

GOULD, Circuit Judge:

This appeal arises from Appellant Ole Hougen's conviction after a jury trial of one count of attempting to commit racially motivated violence, in violation of 18 U.S.C. § 249(a)(1). On appeal, Hougen contends that he is entitled to a new trial because the district court held his trial in violation of the public trial right, under *United States v. Allen*, 34 F.4th 789 (9th Cir. 2022). Hougen also contends that his prosecution was unconstitutional because 18 U.S.C. § 249(a)(1) exceeds Congress' authority under Section Two of the Thirteenth Amendment.[1] For the reasons set forth herein, we affirm Hougen's conviction.

## I

## A

On July 5, 2020, three eyewitnesses observed Hougen, a white man, repeatedly and aggressively slashing a knife at the throat and chest of a Black man ("S.B.") at an intersection in Santa Cruz, California. Two of these

---

[1] Hougen raises other issues on appeal that we address in the memorandum disposition filed contemporaneously with this opinion. We conclude he is not entitled to relief on any of these issues.

witnesses called 9-1-1, and Santa Cruz police officers responded to the scene.

On the scene, law enforcement officers interviewed the eyewitnesses, S.B., and Hougen. According to S.B., Hougen had approached S.B. on the street and asked to buy marijuana. When S.B. declined, Hougen followed S.B., harassing him with racist and homophobic slurs and then charging at him with a knife. S.B. got away without sustaining injury.

No eyewitness saw the beginning of the fight, but all witnesses identified Hougen as the aggressor during the fight. One eyewitness told officers that he heard Hougen repeatedly yelling the N-word at S.B. while attacking him.

For his part, Hougen told officers that S.B. had a knife, which officers confirmed. However, S.B. told officers that it had fallen out of its sheath during the fight, and no eyewitness reported seeing S.B. with a knife.

Officers arrested Hougen and took him to the Santa Cruz Police Department. At the station, Hougen directed racial slurs at Officer Joshua Garcia, who is Hispanic, while Officer Garcia filled out Hougen's arrest paperwork. Officer Garcia then attempted to give *Miranda* warnings to Hougen, but Hougen responded by denigrating Officer Garcia as a "colored" person, a racist, and a liar before saying he did not want to speak to Officer Garcia. Garcia was unable to complete the *Miranda* warnings and stopped talking to Hougen. Another officer, Kevin Bailey, then tried to give *Miranda* warnings to Hougen. Hougen continued to respond belligerently and then requested his lawyer, at which point Officer Bailey stopped trying to talk to him.

**B**

Around October 2020, the FBI took over Hougen's case. FBI agents transferred Hougen to federal custody. During this trip, Hougen admitted to using the N-word in his fight with S.B.

In November 2020, a federal grand jury indicted Hougen on one count of attempting to commit racially motivated violence under 18 U.S.C. § 249(a)(1).

**C**

Jury selection for Hougen's trial began on April 2, 2021, and his trial lasted until April 9, 2021. Hougen's trial was held in the Northern District of California. At that time, the Northern District was operating under General Orders concerning public access to the courthouse, which had been issued in response to the COVID-19 pandemic. As relevant here, General Order 73 provided that: "only persons having official court business authorized by . . . a presiding judge of this court[] may enter any Northern District of California courthouse property." N.D. Cal. General Order 73: Continuing Temporary Restrictions on Courthouse Access due to COVID-19 Public Health Emergency (as amended May 21, 2020). This Order defined "persons having official court business" to include "attorneys, parties, witnesses, or other persons who are required or permitted to attend a specific in-person court proceeding." *Id*. General Order 73 also provided that "[m]embers of the press and public may observe proceedings by telephone or videoconference." *Id.* General Order 72-6 provided that "[j]ury trials may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols." N.D. Cal. General Order 72-6: IN RE: Coronavirus Disease Public Health Emergency (Sep. 16, 2020). The only reference to public access in the

record for Hougen's case comes in a Clerk's Notice entered on the docket before trial. This Clerk's Notice provided, among other things, dial-in information to be used for public access to the trial through an audio conference line (the "AT&T Line").

Neither Hougen nor anyone involved in his trial objected to, or otherwise discussed on the record, the General Orders, Clerk's Notice, or public access to his trial at any time before this appeal.

## D

At trial, the prosecution argued to the jury that Hougen had long harbored violent racial animus toward Black people and assaulted S.B. because of that animus. The prosecution's evidence at trial consisted of: (1) testimony[2] from four witnesses regarding three prior incidents where Hougen had committed racially motivated acts of violence, admitted under Federal Rule of Evidence 404(b) over Hougen's objection; (2) testimony by the three eyewitnesses that saw the incident between Hougen and S.B.; (3) testimony by Santa Cruz police officers regarding this incident, along with recordings of Hougen's statements made to Officers Garcia and Bailey; and (4) testimony by FBI Special Agent Elizabeth Green regarding her involvement in the investigation and the statements Hougen made while being transported to federal custody.

---

[2] The jury also received a stipulation from the parties that Hougen had been criminally convicted for each of these three occurrences. For each occurrence, these convictions included, respectively: (1) exhibiting a deadly weapon; (2) malicious harassment, misdemeanor harassment, and fourth degree assault; and (3) violating civil rights by force or threat, making criminal threats, resisting a peace officer, and battery.

Hougen argued in response that S.B. was the aggressor, that Hougen acted in self-defense and not on account of S.B.'s race, and that law enforcement did not properly investigate the incident. In support of this theory, Hougen elicited testimony on cross-examination: (1) that none of the eyewitnesses saw the beginning of the fight; (2) that one of the eyewitnesses knew S.B. to be an aggressive person; and (3) that one of the responding officers knew that S.B. always carried a knife with him. Hougen called two Santa Cruz police officers involved in the incident to highlight alleged failures to investigate whether S.B. was the aggressor. Hougen also sought to admit evidence that, nine months after the incident with Hougen and in the weeks leading up to trial, S.B. had assaulted a separate person and misled police about the incident. The district court precluded this evidence under Federal Rules of Evidence 404(b) and 403 but permitted the victim to testify to S.B.'s reputation for aggression. The district court gave a self-defense instruction to the jury at Hougen's request.

The jury convicted Hougen of one count of attempting to commit racially motivated violence in violation of 18 U.S.C. § 249(a)(1) after the jury had deliberated for less than two hours.

**E**

After trial, Hougen filed a motion for acquittal and for a new trial and/or to dismiss the indictment for lack of subject matter jurisdiction. He raised issues concerning: (1) the sufficiency of the evidence; (2) the admission of Hougen's prior bad acts; (3) the admission of Hougen's statements in response to the *Miranda* warnings by Officers Garcia and Bailey; (4) the exclusion of evidence concerning S.B.'s alleged pre-trial assault; and (5) the asserted

unconstitutionality of 18 § U.S.C. 249(a)(1) as applied to his case. The district court denied his motion in all respects.

This timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm Hougen's conviction of attempting to commit racially motivated violence in violation of 18 U.S.C. § 249(a)(1).

## II

Hougen first contends that the district court barred in-person public access to his trial, limited public access to the AT&T Line, and that this limitation violated his right to a public trial under *Allen*. 34 F.4th 789. In *Allen*, we held that a district court's "decision to allow only audio access to the trial . . . effected a total closure" that violated the defendant's Sixth Amendment right to a public trial. *Id*. Hougen relies on the General Orders and Clerk's Notice in place during his trial as evidence that the courtroom was unconstitutionally closed and notes that these same Orders were in place during the trial at issue in *Allen* (which also took place in the Northern District of California). However, in sharp contrast to the defendant in *Allen*, Hougen did not raise this public trial issue before the district court. This distinguishes Hougen's case from *Allen* and raises a threshold issue of what standard of review applies to Hougen's claim. We hold that Hougen forfeited his public trial claim, that plain error review applies, and that reversal is not warranted under these circumstances.

## A

We first address the standard of review. The government argues that Hougen, at least, forfeited his public trial claim and that plain error review applies. Hougen counters that we ought to review his public trial claim *de novo* because he did

not have the opportunity to raise this issue before the trial court.

We agree with the government that Hougen forfeited this claim. "[F]orfeiture is the failure to make the timely assertion of a right and subjects an argument to plain error review." *United States v. Lopez*, 4 F.4th 706, 719 n.3 (9th Cir. 2021) (citation and internal quotation marks omitted), *cert. denied*, 143 S. Ct. 121 (2022). It is undisputed that Hougen did not raise his public trial claim at any time before or during his trial. All evidence on which he now relies to support his claimed violation, including the General Orders and the Clerk's Notices, was available to Hougen at that time. Although Hougen had ample opportunity to "timely assert[]" his claim that the district court violated his public trial right, *id.*, he did not do so. That is forfeiture, and plain error review therefore applies. *Id.*; *United States v. Ramirez-Ramirez*, 45 F.4th 1103, 1108–09 (9th Cir. 2022) (applying plain error review to forfeited public trial claim).

## B

Because of Hougen's forfeiture, we do not review this issue *de novo* and *Allen* does not control this case. Instead, we turn to the standard issues that control review for plain error. Hougen contends that he is entitled to reversal even under plain error review. For the reasons set forth below, we conclude that relief is not warranted in his case.

## 1

Because the Supreme Court has made clear that relief under plain error review "is to be 'used *sparingly*, solely in those circumstances in which a miscarriage of justice would otherwise result,'" *United States v. Johnson*, 979 F.3d 632, 636–37 (9th Cir. 2020) (emphasis added) (quoting *United*

*States v. Young*, 470 U.S. 1, 15 (1985)), Hougen's path to relief is narrow.

Under the familiar plain error review test, Hougen must establish the following three prongs to be eligible for relief: "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc) (citation omitted). Those three prongs impose a "heavy burden" on Hougen, but their satisfaction is only a prerequisite to the possibility of relief. *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000). That is so because even if Hougen establishes all three necessary prongs for plain error relief, that only establishes our discretion to grant relief. Under the fourth prong of plain error review, we have the "*discretion* to grant relief," but only if Hougen can demonstrate that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Depue*, 912 F.3d at 1232 (emphasis added) (citation omitted).

The purpose of the fourth prong is "to 'reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error.'" *Johnson*, 979 F.3d at 636 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). "[A]ny exercise of discretion" under this prong "inherently requires 'a case-specific and fact-intensive' inquiry." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018) (quoting *Puckett v. United States*, 556 U.S. 129, 142 (2009)). Even where there are clear, prejudicial errors that satisfy the first three prongs, "countervailing factors [may] satisfy [us] that the fairness, integrity, and public reputation of the proceedings will be preserved absent correction." *Id.*

**2**

In this case, we need not address in any detail whether Hougen's claim meets the first and third prongs of plain error review, which are not contested by the government. Nor do we need to address the parties' dispute as to the second prong of plain error review—whether the district court clearly violated *Allen*. That is because, even if Hougen could establish the second prong, Hougen has not demonstrated that if we decline in our discretion to give relief for the claimed public trial error, that will seriously impugn the fairness, integrity, or public reputation of the court.

"[C]ountervailing factors" are present in this case that demonstrate reversal is unnecessary to preserve the fairness, integrity, and public reputation of the proceedings. *Rosales-Mireles*, 138 S. Ct. at 1909. The most obvious, and important, countervailing factor is that despite lacking the contemporaneous visual access required under *Allen*, the public had substantial means of monitoring Hougen's trial. The AT&T Line provided the public with contemporaneous audio access to Hougen's trial. Through this audio line, the public could hear argument, listen to testimony, and evaluate the district court rulings as they were made by the district court. Second, the public could obtain full transcripts of the proceedings after the fact on the public docket. Finally, media coverage of the trial offered still another avenue of public access.[3] Together, the AT&T Line, available transcripts of proceedings, and the documented media access served (albeit imperfectly) the central purposes of the public

---

[3] *See, e.g.,* Christina Carrega, *Man sentenced to nearly 7 years for attacking Black man with knife was repeat hate crime offender*, CNN, Dec. 3, 2021, https://www.cnn.com/2021/12/03/us/california-man-hate-crime-sentence/index.html.

trial right by giving assurance that the public could ascertain whether Hougen was "fairly dealt with and not unjustly condemned" and "keep[ing] his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (cleaned up).

Hougen stresses how critical visual access is to the public trial right, as we set forth in *Allen*. We do not disagree that visual access is vital to this right. Assuming such contemporaneous visual access was not available here, the above-mentioned alternate avenues of access are insufficient for purposes of the public trial right.

But Hougen faces a higher burden on plain error review than merely making out a constitutional error under *Allen*. He must show how the lack of this access seriously affected the fairness, integrity, or public reputation of the proceedings. We do not believe it did. Hougen indeed offers no evidence that anyone was denied access to the trial, that anything material (let alone any misconduct) occurred at trial that did not come through on the AT&T Line or transcripts, nor that the proceedings, or our review thereof, were affected at all by the lack of visual access. "There has been no showing [] that the potential harms flowing from a courtroom closure came to pass in this case." *Weaver v. Massachusetts*, 582 U.S. 286, 304 (2017). The harms of the alleged district court error appear to be limited to the fact of the error itself. But "[f]rom the defendant's standpoint," the trial itself proceeded fairly. *Id.* at 1910.

Against this minimal showing of harm to the fairness of Hougen's trial, we must balance "the costs to the fairness, integrity, and public reputation of judicial proceedings that would alternatively result from noticing the error." *United*

*States v. Williams*, 974 F.3d 320, 345 (3d Cir. 2020). In this case, the costs of reversal and remand for a new trial would be substantial. First, the Supreme Court has stated that a "high degree of caution" should be taken before reversing for retrial on plain error review. *Rosales-Mireles*, 138 S. Ct. at 1909. The rationale for this heightened caution is plain as day in this case. Retrial would require the parties, witnesses, and district court to duplicate all the work they put in to hold this trial in the first place. And this was no small feat: Hougen's trial lasted a week, involving numerous witnesses on both sides. Reversal would not only undo all prior work on the trial but require trial to be held anew. Starting the trial over with memories of the underlying incident fading would pose a degree of risk for the prosecution, which has the burden of proof and needs to show guilt beyond a reasonable doubt. Moreover, there is still some remaining threat of COVID-19, though the pandemic has been steadily receding, even if it is not now totally absent.

There is another cost to be balanced, that of public perception. Here, reversal would seem more likely to impugn the public's perception of the judiciary than would denial of relief. Reversal here would plainly reward Hougen for withholding an objection and "depriv[ing the district court] the chance to cure the [alleged] violation." *Weaver*, 582 U.S. at 302. Only after a jury found Hougen guilty beyond a reasonable doubt of attempting to commit racially motivated violence did he elect to raise the issue. Reversal under these circumstances would come close to rewarding the type of sandbagging that plain error review seeks to avoid, *see Chess v. Dovey*, 790 F.3d 961, 971 (2015), and in any event strikes us as precisely the kind of "windfall for the defendant" that the Supreme Court has cautioned is "not in the public interest." *Waller*, 467 U.S. at 50. Any risk of

harm to the perception of fairness, integrity, and reputation of the Court caused by limited public access during a dangerous pandemic is not likely as grave as the damage to fairness, integrity, and reputation that would be caused by vacating an otherwise fair conviction. If anything, "[t]he real threat . . . to the 'fairness, integrity, and public reputation of judicial proceedings' would be" throwing out all the work that went into trying and convicting Hougen on the basis of an alleged error that was "never objected to at trial." *United States v. Cotton*, 535 U.S. 625, 634 (2002). Under plain error review, we need not grant such a windfall and we do not here.

## 3

Hougen counters that our holdings in *United States v. Ramirez-Ramirez* and *United States v. Becerra* preclude an individualized fourth prong analysis in cases implicating a structural error, like this one. Neither case does so.

In *Ramirez-Ramirez*, the district court issued a written finding of guilt in *lieu* of publicly announcing the finding in open court. 45 F.4th 1103, 1110 (9th Cir. 2022). While the defendant did not object, we held the district court had clearly committed a public trial error and remanded for a public hearing where the district court would re-issue its findings. *Id.* In so doing, we held that the fourth prong of plain error was "satisfied" by the demonstration of a public trial right violation because such errors are "structural." *Id.* (citing *Weaver*, 582 U.S. at 296 and *United States v. Becerra*, 939 F.3d 995, 1005–06 (9th Cir. 2019)). *Becerra*, likewise, held that "[t]he same reasoning that justified categorizing [an] error as structural"—in that case, issuing jury instructions in writing as opposed to orally—"supports th[e] conclusion" that prong four is "satisf[ied]." 939 F.3d

at 1006 (granting relief under plain error review for violation of requirement that jury be instructed orally).

Fatally for Hougen's appeal of his conviction, however, both *Ramirez-Ramirez* and *Becerra* affirmed that the decision to notice an error under prong four is an exercise of discretion. *Ramirez-Ramirez*, 45 F.4th at 1109 ("[W]e have '*discretion* to notice such error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" (emphasis added) (citation omitted)); *Becerra*, 939 F.3d at 1006 ("[W]e exercise our *discretion* to notice the plain error committed by the district court in this case." (emphasis added)). That is in line with the binding Supreme Court precedent set forth earlier in this opinion. It would be in irreconcilable tension with this authority to read *Ramirez-Ramirez* and *Becerra* to *require* the exercise of our discretion to afford relief under plain error review every time there has been a structural error, regardless of any and all case-specific facts relevant to the fairness, integrity, and reputation of the proceedings. We do not do so here.

Moreover, both cases presented case-specific concerns weighing in favor of relief that are absent here. In both *Becerra* and *Ramirez-Ramirez*, the errors walled off all contemporaneous public access to the proceeding in question. In *Becerra*, the district court issued its jury instructions in writing, hiding "a key aspect of the trial [. . .] from public observation." 939 F.3d at 1005. Likewise, in *Ramirez-Ramirez*, the district court issued its finding of fact in writing, and the public again "lost the ability to contemporaneously monitor proceedings." *Ramirez-Ramirez*, 45 F.4th at 1111. Here, by contrast, the public undisputedly had *some* contemporaneous access to the entirety of the proceedings through the AT&T Line. This at least ensured that Hougen's trial was conducted before the

public ear, ensuring that the fairness, integrity, and public reputation of the proceedings were not "fatally compromised." *Becerra*, 939 F.3d at 1005.

## C

In sum, the balance of costs in this case counsels against reversal. In the absence of evidence of any harm to the fairness of Hougen's trial flowing from the alleged public trial error and in light of the costs that would be imposed by reversal, we conclude that the drastic relief that Hougen seeks is unwarranted. For these and all of the foregoing reasons, we decline to reverse on this ground.[4]

## III

Next, Hougen argues that § 249(a)(1), as applied to his case, exceeds Congress' authority under the Thirteenth Amendment. Hougen raised this issue in his post-trial motion to dismiss for lack of subject matter jurisdiction, which the district court denied. Reviewing *de novo*, *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012), we affirm the district court.

## A

Congress' power under the Thirteenth Amendment is broad. Section Two of the Thirteenth Amendment gives Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968) (citation omitted). Under *Jones*, this power is subject only to a deferential test: "We must … ask whether

---

[4] Because we decline to grant relief on plain error review, we need not and do not reach the government's alternative contention that Hougen waived appellate review of this claim entirely.

Congress could rationally have determined that the acts of violence covered by [the law] impose a badge or incident of servitude on their victims." *United States v. Allen*, 341 F.3d 870, 884 (9th Cir. 2003) (citation omitted) (hereafter "*Allen II*").

Acting under this broad authority, Congress passed § 249(a)(1).   As relevant here, § 249(a)(1) prohibits "attempts to cause bodily injury to any person" "through the use of . . .  a dangerous weapon . . . because of the actual or perceived race, color, religion, or national origin of any person."  18 U.S.C. § 249(a)(1).  In enacting § 249(a)(1), Congress concluded that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry" and that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." 34 U.S.C. § 30501(7).

## B

We have no trouble concluding that § 249(a)(1), and Hougen's prosecution thereunder, passes the deferential *Jones* test.  The rationality of concluding that violence (or attempted violence) perpetrated against victims on account of the victims' race is a badge or incident of slavery is well established.  Every other circuit that has addressed this issue has upheld § 249(a)(1)'s constitutionality.  *United States v. Roof*, 10 F.4th 314, 392 (4th Cir. 2021), cert. denied, 143 S. Ct. 303 (2022) ("[C]oncluding there is a relationship between slavery and racial violence is not merely rational, but inescapable." (cleaned up)); *United States v. Diggins*, 36 F.4th 302, 311 (1st Cir. 2022), cert. denied, 143 S. Ct. 383

(2022); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018); *United States v. Cannon*, 750 F.3d 492, 502 (5th Cir. 2014); *United States v. Hatch*, 722 F.3d 1193, 1205 (10th Cir. 2013)**.**[5]   Neither Hougen nor the dissent offers any persuasive reasoning for why these decisions got it wrong under *Jones*.   And while the Ninth Circuit has not yet addressed this statute, we upheld a similar criminal prohibition on racially motivated violence interfering with the use of public facilities as a valid exercise of Congress' Thirteenth Amendment power. *Allen* II, 341 F.3d at 884.   In so doing, we endorsed the Second Circuit's reasoning that "there exist[s] [an] indubitable connection[] . . . between American slavery and private violence directed against despised and enslaved groups[.]" *United States v. Nelson*, 277 F.3d 164, 190 (2d Cir. 2002) (agreed with by *Allen* II, 341 F.3d at 884).   We draw upon this same unassailable reasoning—which parallels that of Congress in enacting § 249(a)(1)—in confirming that Congress rationally concluded that racial violence imposes a badge and incident of slavery on its victims.   *See generally* A. Leon Higginbothamn, Jr., In the Matter of Color: Race and the American Legal Process 254–55 (1978) (summarizing legal protections for private violence, including murder, against slaves in the colonial period); Michael J. Klarman, From Jim Crow to Civil Rights 29–30 (2004) (reviewing widespread violence by white Southerners against newly-freed Black people in the aftermath of the Civil War).   Hougen's prosecution arose out of an instance of attempted racial violence squarely prohibited by § 249(a)(1).   Under this

---

[5] Even the dissent, which summarily dismisses these decisions, *see* Dissent 42, agrees with the *Hatch* court's indisputable conclusion that "unrestrained master-on-slave violence [w]as one of slavery's most necessary features."  Dissent 33 (citing *Hatch*, 722 F.3d at 1206).

authority, and under the various Circuit precedents cited *infra at* 18–19, his challenge falls short under *Jones*.

## C

Hougen contends that § 249(a)(1) is subject to heightened scrutiny apart from the *Jones* test. He offers two alternative tests that he says govern his claim. We reject his argued position.

First, Hougen argues that the constitutionality of § 249(a)(1) is governed by the more stringent test(s) purportedly announced by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997) and *Shelby County v. Holder*, 570 U.S. 529 (2013). Those cases arose from laws Congress passed under its *Fourteenth* Amendment authority. Other defendants have relied on these cases to challenge § 249(a)(1), and their arguments have been consistently rejected. *Roof*, 10 F.4th at 393–395; *Diggins*, 36 F.4th at 311–317; *Metcalf*, 881 F.3d at 645; *Cannon*, 750 F.3d at 505; *Hatch*, 722 F.3d at 1204–05. We need go no further than reiterate what has been said by the First Circuit: these Fourteenth Amendment cases do not "mention either *Jones* or the Thirteenth Amendment. Rather, the cases concern two different amendments, each with its own unique history, structure, and caselaw." *Diggins*, 36 F.4th at 313. Hougen "furnishes no reason to believe that [these cases'] examination of the Fourteenth Amendment's Enforcement Clause displaces *Jones's* separate analysis of the Thirteenth Amendment." *Id.* at 313. The Supreme Court has clearly said that *Jones* is the test under the Thirteenth Amendment. Absent clear contrary precedent or guidance to the contrary, we join our fellow circuits in rejecting Hougen's argument.

Second, Hougen contends that the Supreme Court announced a separate test for Congress' authority to enact

criminal statutes under the Thirteenth Amendment in *United States v. Kozminski*, 487 U.S. 931 (1988). This argument, again, misses the mark. In *Kozminski*, the Supreme Court did not address the validity of Congress' Thirteenth Amendment power in enacting the statutes at issue. To the extent it touched on this issue in *dicta*, it affirmed that *Jones* governs that question. *See* 487 U.S. at 962 n.8 (citing *Jones*, 392 U.S. at 437–44).

Instead, the Court addressed whether application of two broadly worded criminal statutes, whose language tracked the substantive prohibitions of the Thirteenth Amendment, comported with judicial doctrines of fair notice in the criminal context. *See id.* And while § 249(a)(1) must comply with these doctrines, the fair notice concerns present in *Kozminski* are absent here. Section 249(a)(1)'s prohibitory language is clear and tracks other statutes prohibiting conduct based on race, including that which we upheld in *Allen* II. And there can be no serious question or surprise that Hougen's attempted assault of S.B. fell under § 249(a)(1)'s clear prohibition on racially motivated violence. *Kozminski* is inapposite to the issues present in this case.

## D

In sum, we hold that § 249(a)(1) is a constitutional exercise of Congress' enforcement authority under Section Two of the Thirteenth Amendment. We affirm the district court's denial of Hougen's motion to dismiss his prosecution thereunder for lack of subject matter jurisdiction.

## IV

For the foregoing reasons, we conclude that Hougen has not identified any error warranting relief from his conviction at trial.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting:

Ole Hougen was convicted under 18 U.S.C. § 249(a)(1), which criminalizes, among other things, willfully causing bodily injury to a person on account of that person's race, color, religion, or national origin. Because Congress could not rationally determine that assault or battery motivated by a victim's race, color, religion, or national origin is a badge or incident of slavery, or that § 249(a)(1) is an appropriate remedy for a violation of the Thirteenth Amendment's eradication of slavery and involuntary servitude, § 249(a)(1) was not a valid exercise of Congress's authority under the Thirteenth Amendment. Thus, Hougen was convicted under an unconstitutional statute, and his conviction must be overturned. Therefore, I dissent.

## I

Section 249(a)(1) attaches criminal liability to those who,

> whether or not acting under color of law, willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[] to cause bodily

injury to any person, because of the actual or perceived race, color, religion, or national origin of any person.

18 U.S.C. § 249(a)(1).[1]

Congress passed § 249(a)(1) under § 2 of the Thirteenth Amendment. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111–84, § 4702, 123 Stat. 2190, 2836 (2009).

The Thirteenth Amendment was the first of three Reconstruction-era amendments ratified between 1865 and

---

[1] Section § 249(a)(1) provides in full:

(a) In General.—
(1) Offenses involving actual or perceived race, color, religion, or national origin.—Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person—
(A) shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
(B) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—
(i) death results from the offense; or
(ii) the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.

18 U.S.C. § 249(a)(1).

1870 in the wake of the Civil War (collectively, the Reconstruction Amendments). It states:

> **Section 1.** Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
>
> **Section 2.** Congress shall have power to enforce this article by appropriate legislation.

U.S. CONST. amend. XIII.

Thus, Section 1 announces the Amendment's substantive guarantee: "that slavery or involuntary servitude shall not exist in any part of the United States." *The Civil Rights Cases*, 109 U.S. 3, 20 (1883). And Section 2 vests in Congress the power to enforce that guarantee.

The Fourteenth and Fifteenth Amendments have similar structures. Section 1 of each Amendment sets forth its "substantive guarantees," *Tennessee v. Lane*, 541 U.S. 509, 518 (2004), and each Amendment also has an enforcement clause largely identical to Section 2 of the Thirteenth Amendment, *see* U.S. CONST. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."); U.S. CONST. amend. XV, § 2 ("The Congress shall have power to enforce this article by appropriate legislation.").

Under the enforcement clauses of the Reconstruction Amendments, "Congress may enact . . . prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct,"

meaning the conduct prohibited by the clause containing each Reconstruction Amendment's substantive guarantee. *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727–28 (2003); *see also City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). Congress's power to enact prophylactic legislation, though broad, "is not . . . unlimited." *Lane*, 541 U.S. at 520. "While Congress must have a wide berth in devising appropriate remedial and preventative measures for unconstitutional actions, those measures may not work a 'substantive change in the governing law.'" *Id*. (quoting *City of Boerne*, 521 U.S. at 519). "The Court has never deviated from" the principle "that prophylactic legislation designed to enforce the Reconstruction Amendments," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 225 (2009), "must be an appropriate remedy for identified constitutional violations, not 'an attempt to substantively redefine . . . [the] legal obligations'" imposed by the Amendments, *Hibbs*, 538 U.S. at 728 (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000)). Accordingly, "substantive redefinition of the [constitutional] right at issue" is not "appropriate prophylactic legislation." *Id*.; *see also City of Boerne*, 521 U.S. at 519 ("Congress does not enforce a constitutional right by changing what the right is.").

For purposes of assessing prophylactic legislation passed pursuant to Section 5 of the Fourteenth Amendment, the Supreme Court has adopted a type of means-end test. *See Hibbs*, 538 U.S. at 728. For Congress's action to fall within its Section 5 authority, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of*

*Boerne*, 521 U.S. at 520.[2]    Because Section 5 of the Fourteenth Amendment is worded almost identically to Section 2 of the Thirteenth Amendment, scholars and jurists have argued that the congruence-and-proportionality test is salient to determining the constitutionality of prophylactic Thirteenth Amendment legislation.   *See* Jennifer Mason McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power after City of Boerne v. Flores*, 88 Wash. U. L. Rev. 77, 142 (2010); *United States v. Cannon*, 750 F.3d 492, 511–12 (5th Cir.) (Elrod, J., concurring), *cert. denied*, 574 U.S. 1029 (2014).  But the Supreme Court has not, as yet, applied the test in the Thirteenth Amendment context. Rather, it has long held that "the province and scope of the Thirteenth and Fourteenth Amendments are different," and that "[w]hat Congress has power to do under one, it may not have power to do under the other."  *The Civil Rights Cases*, 109 U.S. at 23.

## II

Because we cannot rely on Fourteenth Amendment jurisprudence to determine the scope of Congress's legislative authority under the Thirteenth Amendment's enforcement clause, we must instead discern the test for that clause from the Thirteenth Amendment's text and history, as interpreted by the Supreme Court.

---

[2] The Supreme Court has not expressly adopted the congruence-and-proportionality test for prophylactic legislation passed under the Fifteenth Amendment, *see Nw. Austin*, 557 U.S. at 204, although the Court has stated that Congress has "parallel power to enforce the provisions" of the Fourteenth and Fifteenth Amendments, *City of Boerne*, 521 U.S. at 518; *see also Allen v. Milligan*, 143 S. Ct. 1487, 1539 n.19 (2023) (Thomas, J., dissenting).

A

Section 2 of the Thirteenth Amendment authorizes "appropriate legislation" to enforce Section 1.  U.S. CONST. amend. XIII, § 2.  Thus, it is necessary to start by examining Section 1's substantive guarantee.

Section 1 states that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1.  The clause "abolished slavery, and established universal freedom" in the United States. *The Civil Rights Cases*, 109 U.S. at 20; *see also id*. at 24 ("The Thirteenth Amendment has respect, not to distinctions of race, or class, or color, but to slavery.").

The language in Section 1 was well understood at the time of the Thirteenth Amendment's enactment.  The clause "reproduced the historic[] words" of the Northwest Ordinance of 1787.[3]  *Bailey v. Alabama*, 219 U.S. 219, 240 (1911).  "The framers of the [Thirteenth] Amendment intentionally used this text precisely *because* it was well known and had a narrow historical meaning.  As used in the Ordinance, the terms 'slavery and involuntary servitude' referred to a specific and legally codified 'private economical relation' between a 'master' and a 'servant.'" Kurt Lash, *Roe and the Original Meaning of the Thirteenth Amendment*, 21 Geo. J.L. & Pub. Pol'y, 131, 132 (2023). Section 1's eradication of slavery eliminated "a state of affairs which had existed in certain states of the Union since

---

[3] Article VI of the Northwest Ordinance states that "[t]here shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment of crimes whereof the party shall have been duly convicted[.]"

the foundation of the government." *Robertson v. Baldwin*, 165 U.S. 275, 282 (1897); *see also Butler v. Perry*, 240 U.S. 328, 332 (1916) (stating that the Thirteenth Amendment "was adopted with reference to conditions existing since the foundation of our government").

"[T]he words 'involuntary servitude' were . . . intended to cover" other conditions "which might have been a revival of the institution of slavery under a different and less offensive name," *Robertson*, 165 U.S. at 282, such as "those forms of compulsory labor akin to African slavery which, in practical operation, would tend to produce like undesirable results," *Butler*, 240 U.S. at 332. "It was very well understood" that involuntary servitude referred to "any state of bondage" in "which the personal service of one man is disposed of or coerced for another's benefit." *Bailey*, 219 U.S. at 241 (citation omitted). In *United States v. Kozminski*, the most recent Supreme Court decision interpreting the Thirteenth Amendment, the Court confirmed that "'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." 487 U.S. 931, 952 (1988). One form of involuntary servitude that is forbidden by the Thirteenth Amendment is peonage, which "may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to master." *Clyatt v. United States*, 197 U.S. 207, 215 (1905); *see also Taylor v. Georgia*, 315 U.S. 25, 29 (1942) (holding that "coerced labor is peonage" and that it "is of course clear that peonage is a form of involuntary servitude within the meaning of the Thirteenth Amendment").

Therefore, Section 1 of the Thirteenth Amendment provides a substantive guarantee that slavery (a private economic relation between a master and a servant), as well as any other state of bondage where one person is forced to labor for another, are eradicated.  Any legislation enacted by Congress must be at least rationally related to remedying a violation of this constitutional right.  *See Nw. Austin*, 557 U.S. at 204.

## B

Having explained Section 1's substantive guarantee, we must next ascertain the limits on how Congress can enforce that guarantee.  Section 2 of the Thirteenth Amendment states that "Congress shall have power to enforce this article by appropriate legislation."  U.S. CONST. amend. XIII, § 2.  Addressing the scope of Congress's enforcement power under Section 2 for the first time in the *Civil Rights Cases*, the Supreme Court stated that "the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States."  109 U.S. at 20.  Nearly a century later, the Court clarified the scope of Congress's prophylactic legislative authority under Section 2, holding that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation."  *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968).  This power is broad, and "the varieties of private conduct that it may make criminally punishable or civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude."  *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971).  But Congress's authority is nevertheless constrained by the requirement that

"prophylactic legislation" passed by Congress not effect a "substantive redefinition" of the rights granted by the Thirteenth Amendment.  *Hibbs*, 538 U.S. at 728; *see also Allen v. Cooper*, 140 S. Ct. 994, 1004 (2020) ("Congress cannot use its 'power to enforce' the [Thirteenth] Amendment to alter what that Amendment bars." (citation and quotation marks omitted)).

In the context of Thirteenth Amendment jurisprudence, the phrase "badges and incidents of slavery" has a specific meaning set by history and Supreme Court interpretation. An incident of slavery, as that term was used in antebellum commentary, "was any legal right or restriction that necessarily accompanied the institution of slavery," particularly "the aspects of property law that applied to the ownership and transfer of slaves" and "the civil disabilities imposed on slaves by virtue of their status as property." Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 575 (2012); *see also id.* at 570–71 & 571 n.38 (stating that, in 1867, an "incident" was defined as "[a] thing depending upon, appertaining to, or following another, called the principal" (citing Bouvier's Law Dictionary (7th ed. 1867)).  Judicial decisions from the antebellum period reflect this understanding of an "incident" of slavery as something necessarily tied to a master's property rights in the slave.  *See Prigg v. Pennsylvania*, 41 U.S. 539, 613 (1842) (stating that because the Constitution's Fugitive Slave Clause "contains a positive and unqualified recognition of the right of the owner in the slave . . . . then all the incidents to that right attach also"); *see also In re Archy*, 9 Cal. 147, 162 (1858) ("[W]here slavery exists, the right of property of the master in the slave must follow[] as a necessary incident.").  Thus, "incident" "has [a] clear, finite, historically determined

meaning" that refers to the legal aspects of the system of slavery. McAward, *Defining the Badges and Incidents of Slavery* at 575. Such legal aspects, comprising "the inseparable incidents of the institution" of slavery, included "[c]ompulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities." *The Civil Rights Cases*, 109 U.S. at 22.

Whereas the term "incident" of slavery has a narrow historical meaning, the meaning of the term "badge" of slavery is broader. "In its most general sense, the term 'badge of slavery' . . . refers to indicators, physical or otherwise, of African Americans' slave or subordinate status." McAward, *Defining the Badges and Incidents of Slavery* at 575; *see also United States v. Hatch*, 722 F.3d 1193, 1198 (10th Cir. 2013) (stating that "'badge,' in antebellum legal discourse, was sometimes used as shorthand for 'evidence permitting an inference from external appearances to legal status'" as a slave (citation omitted)), *cert. denied*, 134 S. Ct. 1538 (2014). For example, one such physical badge was the requirement, "[i]n slave times[,] in the slave states," that a freed slave "carry with him a copy of a judicial decree or other evidence of his right to freedom or be subject to arrest." *Hodges v. United States*, 203 U.S. 1, 19 (1906), *overruled by Jones*, 392 U.S. at 441 n.78. Following the end of the Civil War and the abolition of slavery, "[s]kin color was no longer a badge of slavery," and the term instead came "to reference ways in which southern governments and white citizens endeavored to reimpose upon freed slaves the incidents of slavery or, more generally, to restrict their rights in such a way as to

mark them as a subordinate brand of citizens." McAward, *Defining the Badges and Incidents of Slavery* at 577–78.

Building on this understanding, the Supreme Court has defined the badges and incidents of slavery as the denial of "those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery." *The Civil Rights Cases*, 109 U.S. at 22; *see also Griffin*, 403 U.S. at 105. Such a denial of fundamental civil rights imposes on its victims a "form of stigma so severe" that it is akin to marking them as a legally inferior group (*i.e.*, a badge of slavery), and thus violates the Thirteenth Amendment. *City of Memphis v. Greene*, 451 U.S. 100, 128 (1981). The Court has most often characterized these "fundamental rights[,] which are the essence of civil freedom," in terms of economic and legal parity with white people—specifically, ensuring that black people have "the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens." *The Civil Rights Cases*, 109 U.S. at 22; *see also Alma Soc'y Inc. v. Mellon*, 601 F.2d 1225, 1238 (2d Cir. 1979) (stating that "[t]he Supreme Court has never considered that the 'badges or incidents' went beyond" a lack of these fundamental rights). Therefore, the Court has held that "racial discrimination [that] herds men into ghettos and makes their ability to buy property turn on the color of their skin" is a badge or incident of slavery, as is denying black people "the freedom to buy whatever a white man can buy [and] the right to live wherever a white man can live." *Jones*, 392 U.S. at 442–43. The Court has similarly concluded that "racial discrimination that interferes with the making and enforcement of contracts for private educational services" is

a badge or incident of slavery. *Runyon v. McCrary*, 427 U.S. 160, 179 (1976).

For the same reasons, the use of violence to deprive a person of the fundamental rights of citizenship is a badge or incident of slavery. Historically, "unrestrained master-on-slave violence [w]as one of slavery's most necessary features." *Hatch*, 722 F.3d at 1206; *see also United States v. Nelson*, 277 F.3d 164, 189–90 (2d Cir. 2002) ("[I]n several States[,] 'legislators expressly deprived slaves who were violently abused by whites of the protections of the common law of crimes by passing exculpatory acts that granted . . . slave masters . . . legal rights to beat, whip, and kill bondsmen.'" (citation omitted)). Thus, the Supreme Court has held that conspiratorial, racially discriminatory private actions using "force, violence and intimidation" to deprive individuals of basic rights is a badge or incident of slavery that Congress can legislate against to enforce the Thirteenth Amendment's substantive guarantee. *Griffin*, 403 U.S. at 90. But such force, violence, or intimidation must have been committed for the purpose of preventing the victims:

> from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and [state law], including but not limited to their rights to freedom of speech, movement, association and assembly; their right to petition their government for redress of their grievances; their rights to be secure in their persons and their homes; and their rights not to be

> enslaved nor deprived of life and liberty other than by due process of law.

*Id.*; *see also id.* at 105.

Accordingly, not every act of private discrimination or violence—however ugly it might be—is a badge or incident of slavery. "Mere discriminations on account of race or color were not regarded as badges of slavery." *The Civil Rights Cases*, 109 U.S. at 25.[4] Actions with only "symbolic significance" are not badges or incidents of slavery either. *Greene*, 451 U.S. at 128. Therefore, the Court has held that neither a private actor's refusal of "admission to an inn, a public conveyance, or a place of public amusement, on equal terms with all other citizens," *The Civil Rights Cases*, 109 U.S. at 24, nor a city's decision to close swimming pools rather than attempt to operate them on a desegregated basis, *see Palmer v. Thompson*, 403 U.S. 217, 226 (1971), nor the closing of a city street that would "have a disparate effect on an identifiable ethnic or racial group," *Greene*, 451 U.S. at 128, are badges or incidents of slavery. Similarly, the Court has never held that an assault or battery—when committed without an intent to deprive a person of fundamental rights of citizenship—was a badge or incident of slavery, even if there is evidence that the perpetrator was motivated by animus against a person's protected characteristic.

---

[4] *Jones* noted that "the present validity of the position taken by the [*Civil Rights Cases*] majority" that private discrimination was not a badge or incident of slavery was "rendered largely academic by Title II of the Civil Rights Act of 1964," enacted under the Fourteenth Amendment. 392 U.S. at 441 n.78 (citing *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964) and *Katzenbach v. McClung*, 379 U.S. 294 (1964)). Nevertheless, *Jones* did not overrule the *Civil Rights Cases* on this point, and it remains good law.

C

Summarizing the relevant principles, Section 2 of the Thirteenth Amendment authorizes Congress to develop appropriate remedies to vindicate the substantive constitutional guarantee of Section 1, which is to eradicate slavery and involuntary servitude. In order to do so, Congress has the authority to identify the badges and incidents of slavery and to enact appropriate legislation to abolish them. *See Jones*, 392 U.S. at 440. Although Congress enjoys broad prophylactic legislative authority in this area, its power "is not . . . unlimited," *Lane*, 541 U.S. at 520, because the determination of "what are the badges and incidents of slavery," *Jones*, 392 U.S. at 440, must be rationally related to the constitutional right at issue—the right to "universal civil freedom," *Bailey*, 219 U.S. at 241, via the eradication of slavery and involuntary servitude. Supreme Court precedent has made clear that Congress's "authority to translate that determination into effective legislation," *Jones*, 392 U.S. at 440, does not "empower Congress to address all modern forms of injustice, or even all modern manifestations of racial bias," McAward, *Defining the Badges and Incidents of Slavery* at 569–70. Although Congress could rationally determine that conduct intended to deprive individuals of the rights of citizenship, whether through legislation or private action, is a badge or incident of slavery, the Thirteenth Amendment does not authorize legislation that prohibits private discriminatory conduct that was not committed with such an intent, even if the conduct was motivated by animus. Legislation criminalizing such conduct goes "beyond redressing actual constitutional violations" of the Thirteenth Amendment, *Allen*, 140 S. Ct. at 1004, and so is not appropriate prophylactic legislation, *Hibbs*, 538 U.S. at 728.

## III

Under these principles, in order to determine if § 249(a)(1) is an appropriate remedy to vindicate the Thirteenth Amendment's substantive guarantee, we must assess whether Congress could rationally determine that the conduct criminalized by the statute is a badge or incident of slavery. The conduct criminalized by § 249(a)(1) is willfully causing bodily injury to a person because of that person's protected characteristic (race, color, religion, or national origin). Therefore, the question is whether Congress could rationally determine that an assault or battery (which is a state-law criminal offense regardless of the victim's race, color, religion, or national origin) is a badge or incident of slavery, solely because the perpetrator committed the crime on account of the victim's protected characteristic.

Under the Supreme Court's caselaw, this type of conduct is not a badge or incident of slavery. Assault or battery that is carried out due to animus against persons with a protected characteristic is akin to mere private discrimination, which the Court has long made clear is not a badge or incident of slavery. *See The Civil Rights Cases*, 109 U.S. at 25. Such a crime is unlike violence intended to deprive persons of their fundamental rights as citizens, which the Supreme Court held was a badge or incident of slavery in *Griffin*. *See* 403 U.S. at 105. The distinction between the legislation at issue in *Griffin* and in this case is clear. In *Griffin*, two white defendants mistakenly believed that the driver of a car was a civil rights worker, and conspired to block the passage of the car upon the public highways and attack the plaintiffs with deadly weapons for the purpose of preventing the plaintiffs and other black people, "through such force, violence and intimidation, from seeking the equal protection of the laws and from enjoying the equal rights, privileges and

immunities of citizens under the laws of the United States and the State of Mississippi." *Id.* at 90. The defendants were charged under 42 U.S.C. § 1985(3), which criminalizes a conspiracy, "on the highway or on the premises of another," that is committed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Id*. at 92 (citation and quotation marks omitted). The Supreme Court upheld the statute, "conclud[ing] that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men," including but not limited to "the right of interstate travel." *Id*. at 105.

By contrast, § 249(a)(1) lacks the key element of § 1985(3), in that it does not require the government to show that the purpose of the assault or battery was to deprive the victim of the fundamental civil rights of citizenship. Rather, it requires the government to show only that the defendant perpetrated the assault or battery because of the victim's protected characteristic. This type of criminal enactment falls short in two ways.

First, it is not rationally related to the substantive guarantee of Section 1, which is the eradication of slavery and involuntary servitude. There is no constitutional right to be free from private acts of violence, even if they are committed due to a discriminatory motive. Congress could not rationally determine that private violence, which is motivated by neither a master-servant relationship between the perpetrator and victim nor a desire to deprive the victim of the fundamental rights of a free citizen, is a badge or

incident of slavery.  To the contrary, the Supreme Court has made clear that Congress does not possess a "general federal police power," *United States v. Lopez*, 514 U.S. 549, 564 (1995), and that "the suppression of violent crime and vindication of its victims" is a quintessential example of "[state] police power, which the Founders denied the National Government," *United States v. Morrison*, 529 U.S. 598, 618 (2000).  Section 249(a)(1) therefore represents an improper federal exercise of state police power, both by converting ordinary state-law battery and assault into a federal crime, and by imposing an enhanced penalty for such assaults if committed with a "discriminatory motive, or reason, for acting."[5]  *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993).  The Supreme Court has warned Congress against adopting remedial measures, such as § 249(a)(1),

---

[5] Title 18, Chapter 7 of the U.S. Code lists the federal assault crimes. Unlike § 249(a)(1)'s general prohibition on private, animus-motivated assault (and battery), each federal assault statute contains a nexus to the federal government or to interstate commerce.  *See* 18 U.S.C. §§ 111 (assaulting a federal officer or employee), 112 (assaulting a foreign official or official guest), 113 and 114 (assaulting or maiming within the special maritime and territorial jurisdiction of the United States), 115 (assaulting a member of the immediate family of a United States official, a United States judge, or a federal law enforcement officer), 116 (female genital mutilation, if the defendant or victim traveled in interstate or foreign commerce), 117 (domestic assault within the special maritime and territorial jurisdiction of the United States), 118 (interference with a federal law enforcement agent, engaged, within the United States or the special maritime and territorial jurisdiction of the United States, in the performance of protective functions for a federal officer or employee), and 119 (knowingly making public restricted personal information about a federal officer or employee with the intent to threaten, intimidate, or incite the commission of a crime of violence against that person or a member of that person's immediate family).

that work a "substantive redefinition of the [constitutional] right at issue." *Hibbs*, 538 U.S. at 728.

Second, § 249(a)(1) is overbroad, as demonstrated most clearly by the fact that convictions could be (and have been) entered and upheld under the statute, even where the violence at issue was perpetrated against persons belonging to demographic groups that have never experienced or been at risk of slavery in this country. *See Cannon*, 750 F.3d at 512 (Elrod, J., concurring) ("[T]he plain language of § 249(a)(1) . . . . reaches even racial violence against white persons when those acts are based on race."). For example, in *United States v. Maybee*, the Eighth Circuit upheld a § 249(a)(1) conviction for a racially motivated attack against Mexicans. 687 F.3d 1026, 1030–32 (8th Cir. 2012). And in *United States v. Earnest*, the defendant was convicted under § 249(a)(1) for shooting at Jews inside of a synagogue. 536 F. Supp. 3d 688, 718 (S.D. Cal. 2021). Although Congress could rationally determine that private conduct subjecting a victim to peonage, *see Taylor*, 315 U.S. at 29, or "serious [human] trafficking," *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (citing 18 U.S.C. § 1589), is a badge or incident of slavery, there is no rational basis for determining that a state-law assault committed because the victim was a Jew, a Catholic, a Muslim, a Korean, an Argentinian, a Mexican, or a white person (to name just a few of the many demographic groups that were never enslaved in this country) vindicates the Thirteenth Amendment's ban on slavery and involuntary servitude.

Because § 249(a)(1) bears no rational relationship to any determination that the conduct it criminalizes is a badge or incident of slavery, the law fails to implement the "substantive guarantee" of the Thirteenth Amendment. *Lane*, 541 U.S. at 518. Thus, Congress exceeded its

prophylactic legislative authority in enacting § 249(a)(1), and it must be struck down.

## IV

In holding to the contrary, the majority relies on congressional findings, out-of-circuit cases, and precedent analyzing a different statute, 18 U.S.C. § 245(b)(2). Maj. Op. at 18–19. The majority's reliance is misplaced.

Congress's findings related to § 249(a)(1), codified at 34 U.S.C. § 30501, do not provide a basis on which Congress could find that the conduct criminalized by § 249(a)(1) is rationally related to eradicating slavery or involuntary servitude as a badge or incident of slavery. Maj. Op. at 18. First, Congress stated that because "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race, color, or ancestry[,] . . . eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." 34 U.S.C. § 30501(a)(7).[6]    As explained above, slavery was

---

[6] 34 U.S.C. § 30501(a)(7) provides:

> For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges,

historically enforced through legally sanctioned violence by masters against slaves or—once the former slaves were freed—through violence that was intended to prevent them from exercising their fundamental rights as citizens. *See supra* pp.10–15. Congress, however, fails to explain how it rationally determined that "eliminating racially motivated violence" writ large, without an element requiring the government to prove a connection between such violence and the deprivation of civil rights, is addressed to either eradicating slavery or its badges and incidents.

Congress's findings as to religious and national origin groups are also inadequate to support the majority's holding. *See* 34 U.S.C. § 30501(a)(8).[7] Congress found that, because at the time the Reconstruction Amendments "were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct 'races,'" eliminating the badges and incidents of slavery renders it "necessary to prohibit assaults on the basis of real

---

incidents, and relics of slavery and involuntary servitude.

[7] 34 U.S.C. § 30501(a)(8) provides:

Both at the time when the 13th, 14th, and 15th amendments to the Constitution of the United States were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct "races[.]" Thus, in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States.

or perceived religions or national origins." *Id*. Again, Congress does not explain why the identification of certain individuals as members of groups with the same religion or national origin gives rise to a rational inference that private violence against such individuals relates to eradicating slavery or involuntary servitude, or constitutes a badge or incident of slavery. Such a broad enactment may be authorized by the Fourteenth Amendment (subject to principles of congruence and proportionality, *see City of Boerne*, 521 U.S. at 520), but it bears no rational relation to vindicating the substantive guarantee of the Thirteenth Amendment.

Next, the majority relies on the fact that the other circuits to have addressed this issue have upheld § 249(a)(1) as a valid exercise of Congress's Thirteenth Amendment power. Maj. Op. at 18–19. However, these decisions, like the majority opinion, involve limited reasoning, excessive deference to Congress under *Jones*, or both. *See United States v. Diggins*, 36 F.4th 302, 311 (1st Cir.), *cert. denied*, 143 S. Ct. 383 (2022); *United States v. Roof*, 10 F.4th 314, 392 (4th Cir. 2021) (per curiam), *cert. denied*, 143 S. Ct. 303 (2022); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir.), *cert. denied*, 139 S. Ct. 412 (2018); *Cannon*, 750 F.3d at 502–03; *Hatch*, 722 F.3d at 1205–06.

Finally, the majority relies, Maj. Op. at 19, on our decision in *United States v. Allen*, in which we upheld a similarly worded statute against a Thirteenth Amendment challenge. *See* 341 F.3d 870, 884 (9th Cir. 2003). That statute, 18 U.S.C. § 245(b)(2)(B), imposes criminal liability on an individual who:

> whether or not acting under color of law, by force or threat of force willfully injures,

> intimidates or interferes with, or attempts to injure, intimidate or interfere with . . . any person because of his race, color, religion or national origin because he is or has been . . . participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof.

*Allen* held that "Congress could rationally have determined that the acts of violence covered by § 245(b)(2)(B) impose a badge or incident of servitude on their victims," but provided little analysis to support this conclusion. 341 F.3d at 884 (citation omitted).

*Allen*'s affirmance of § 245(b)(2)(B) does not support the majority's conclusion that § 249(a)(1) is constitutional. Section 245(b)(2)(B) prohibits private violence that deprives an individual of a fundamental right of citizenship, "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof." 18 U.S.C. § 245(b)(2)(B). This formulation of the offense brings § 245(b)(2)(B) in line with precedent: the Supreme Court has indicated that similar violence aimed at preventing the free exercise of one's civil rights constitutes a badge or incident of slavery and that Congress can validly legislate against such violence. *See Griffin*, 403 U.S. at 105. But § 249(a)(1) is missing this crucial component. Thus, § 245(b)(2)(B) is distinguishable, and *Allen* does not control the outcome of this case.

## V

Because Congress could not have rationally determined that the conduct proscribed in § 249(a)(1) is a badge or

incident of slavery, or that the remedy for private discriminatory violence is related to ensuring that slavery or involuntary servitude ceases to exist in the United States, Congress was not authorized under the Thirteenth Amendment to enact that statute. By drafting § 249(a)(1) to apply to violence motivated by an overbroad range of protected characteristics, Congress redefined the Thirteenth Amendment's substantive guarantee—to eradicate slavery and involuntary servitude—as a guarantee of protection against any private violence by a person with discriminatory animus. Such substantive redefinition of a constitutional right, unsupported by the Thirteenth Amendment's text and history or Supreme Court caselaw, is not "appropriate prophylactic legislation." *Hibbs*, 538 U.S. at 728. Thus, to the extent § 249(a)(1)'s constitutionality is based on the Thirteenth Amendment, the statute is invalid.[8] Therefore, Hougen's "conviction under this statute must be reversed as the statute is unconstitutional." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). Because the majority nevertheless affirms Hougen's conviction under § 249(a)(1), I dissent.

---

[8] Neither party argues that § 249(a)(1) was authorized by the Fourteenth Amendment, the Commerce Clause, or any other constitutional provision. Any such argument is therefore forfeited. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).